### UNITED STATES v. FALLOCO.

### SAME v. ROSS.

(District Court W. D. Missouri, W. D. January 7. 1922.)

Nos. 4496, 4514.

1. **Searches and seizures** ⊂⟶7—**Fourth Amendment does not affect state officials.**

    The Fourth Amendment to the United States Constitution, prohibiting unlawful searches, is directed only against the federal government and its agencies, and not against individual conduct of state officials.

2. **Criminal law** ⊂⟶394—**Evidence procured by state officers searching without warrant may be used in federal prosecutions.**

    Where police officers of the state, acting as such, made arrests and searches under the state law, the evidence procured by them, if otherwise competent and material, may be used in prosecutions in a federal jurisdic-

tion, even though the search, if made by a federal officer, would have violated the Fourth Amendment.

3. **Criminal law ⊛394—Evidence held to show search by state officers was under direction of federal officers.**

Evidence that the federal officers charged with the enforcement of the Prohibition Act had conferred with police officers of the city to secure co-operation in the enforcement of prohibition, and had instructed the city officers as to the evidence necessary to sustain a prosecution; and that practically all complaints against persons arrested by such police officers were filed in the federal jurisdiction, *held* to show that the police officers in making a search were acting under the direction of the federal officers, so that evidence procured thereby could not be used against defendants because the search was made without warrant.

4. **Criminal law ⊛394—Specific knowledge or direction to state by federal officers unnecessary to invalidate evidence procured by search.**

Where the state and federal officers were co-operating generally in enforcement of the prohibition law, it is unnecessary to show that the federal officers had knowledge of or gave specific directions for the particular search in controversy, which was made without warrant, in order to render the evidence procured by that search incompetent in a prosecution in the federal court.

Tony Falloco and Tony Ross were separately charged with violation of the National Prohibition Act. On separate application of each defendant to suppress evidence against them, obtained by state police officers through a search without warrant. Applications sustained.

Samuel M. Carmean, Asst. U. S. Atty., of Kansas City, Mo., and Byron H. Coon, Asst. U. S. Atty., of Joplin, Mo.

E. H. Gamble and James M. Rader, both of Kansas City, Mo., for defendants.

VAN VALKENBURGH, District Judge. While these two cases arise out of distinct transactions, and involve different facts and circumstances, the same principle is involved, and both motions were heard together. A single ruling will dispose of both applications. The seizures in both cases were made by police officers. In the Falloco case the defendant's premises consisted of a house, barn, and shed, all of which were within the same inclosure; that is to say, situated upon the same lot of ground in Kansas City, Mo. The officers passed from the shed through a sort of harness room and through a door which led into an underground apartment; that part of the ground in which this latter apartment was situated being higher than that upon which the shed stood. They there found a still, some whisky, and some mash for use in making whisky. The defendant was present and in charge. The still was in operation. They arrested the defendant and turned him and a sample of the whisky over to federal officers, and this prosecution resulted. The attention of the officers was directed to the property in question by smelling the odor of the distillation while walking their beat on the street along which the building was located. Their sense of smell led them to the hidden illicit apparatus and product. They had no search warrant.

In the Ross Case the officers had been directed by their superiors of

the police department to proceed to the Ross premises, where there was reason to believe that the illicit manufacture of whisky was in progress. As they approached the house the fumes of the distillation were distinctly perceptible. They demanded admission to the house, which was subsequently granted, and they gained access to one of the rooms in which a considerable quantity of liquor was found, and beneath the floor was found a still in operation and about 17 barrels of mash. Here again the officers had no search warrant.

The defendants base their application for a suppression of this evidence upon the ground that the relationship existing between the police officers and the enforcement officers of the United States was of such a nature as to make the former substantially the representatives of the government, or, at least, to subject them and their acts to the provisions of the federal Constitution, and more specifically the Fourth and Fifth Amendments thereto. A review of the testimony is essential to the proper application of the legal principles involved.

Mr. Shrader Howell, called on behalf of the defendants, testified that he was formerly, and at the time these transactions arose, federal prohibition director for this district; that along in April, 1920, under the former board of police commissioners, he arranged for a conference with the board in respect to securing co-operation beween the state and federal authorities by reason of the concurrent jurisdictions. He said:

"We did have that conference, I think, with Mayor Cowgill and Mr. Ransom and Mr. Halpin. At that time I think the state law was not in effect, * * * but we had a general understanding they would lend every co-operation they could with reference to making arrests. And as near as I can recollect, when the new board came in, in January, according to my best recollection, I arranged a conference with the commissioners in connection with George Williams, who was the agent in charge here at Kansas City. * * * The conference with Commissioners Foster and Wilson was very brief; in other words, they merely said they would co-operate and referred me to Chief Edwards, and we had our real talk with him.

"Q. And at that conference you asked him to assist the federal officers in the enforcement of the Prohibition Act? A. Yes, sir.

"Q. What did he say? A. He very promptly said that anything his department could do we could count on.

"Q. Now, from that time forward state whether or not your agents in charge of the enforcement of the Volstead act had conferences with the police officers in regard to the enforcement of the Prohibition Act. A. I know they conferred in the handling of cases with various officers, but I don't know that myself.

"Q. Now, from that time forward, August 1, 1921, do you have any knowledge of the number of cases that were turned over to the federal officers here charged with the enforcement of the Volstead Act? A. Well I know there were a great number, but I couldn't give any definite estimate even.

"Q. There was a working agreement that was in continual process of operation at least from that time forward? A. Yes; they were turning over violators of the Prohibition Act to the federal agents.

"Q. Did you have any conference with either of these two boards of police commissioners upon the subject of procurance of search warrants as a pre requisite to obtaining of testimony? A. No, sir.

"Q. The subject of search warrants was not mentioned? A. Not that I recall; no, sir."

Cross-examination:

"Q. This conversation that you had was just a general conversation with the commissioners in reference to the National Prohibition Act, was it, and its application? A. Well, with reference to co-operation between the two departments.

"Q. Now at that time did you tender to the police force or to the commissioners here in Kansas City any of your agents to assist in making raids or arrests? A. No; that matter was not gone into.

"Q. Did you instruct them in what manner to make this evidence? A. No, sir.

"The Court: When you speak of co-operation, Mr. Howell, just describe what you had in mind in this conference. A. What was discussed at that conference was this: At that time the docket was congested, and after conferring with Judge Sullinger and I think the commissioner, we tried to work out some plan by which as many cases as could be prosecuted under the state law should go to the state courts, and had a general understanding that first offenses, in the absence of any particular reasons, should be handled in state courts. That would release the commissioner of the court and the federal court to handle more aggravated cases and second offenses. That was the basis of our whole conference.

"The Court: As I understand you, your understanding with them was in the way of co-operation—was to try to stimulate the local authorities into a greater responsibility in the prosecution of cases in their jurisdiction, and not leave the entire matter to the consideration of government officers? A. That was the idea back of the conference, so far as I was concerned."

Redirect examination:

"Q. Isn't that one of the reasons you went to the police department, in order that you might from them procure support and evidence which they had obtained in searches and seizures without putting your department to the trouble of procuring search warrants? A. No; that question wasn't acute at that time.

"Q. Later on did it become acute? A. We never discussed that matter at all. The matter of how the police should procure evidence was a matter I thought entirely out of my jurisdiction.

"Q. Isn't that the one idea that actuated you in inviting the police department to co-operate with your department? A. No; I can't say it was; of course, we wanted to get results, but that wasn't the purpose of our conference."

Pearl Horn, called as a witness on behalf of the defendants, testified that he was the sergeant in charge of the so-called raiding squads of the Kansas City police department during the month of August, 1921. To this Chief Edwards also testified. Horn was in charge during July and August. His duties, among others, included dealing with violations of the Volstead Act. 41 Stat. 305.

"Q. State whether or not you had any conference with any of the federal officers here with respect to what should be done in the way of procuring testimony to be used in the prosecution of violators of the Volstead Act. A. Well, that was merely a sort of school. I guess you would call it that. None of us was familiar with getting evidence, and they just merely had a little school one evening to instruct us along those lines.

"Q. Where was that? A. That was in one of the rooms here on the third floor [of the Federal Building].

"Q. Do you remember who was present? A. Mr. Coon, I believe.

"Q. The assistant United States district attorney? A. Yes, sir.

"Q. What occurred there? Who else was present besides you and Assistant District Attorney Coon? A. Mr. Wilson—Commissioner Wilson—and Chief Edwards and Officer Cole, Officer Chandler, and Officer Snow.

"Q. Now, what occurred there?    A. They just instructed us how to secure the evidence so it would be a case when brought up here, so it wouldn't have to take up the time—the best way to secure evidence.

"Q. What did he say—what is your recollection of what was said there? A. Well, I don't just recollect other than that it was testimony in general under the Volstead Act.

"Q. As to what evidence would be sufficient to convict?    A. Yes.

"Q. And what to do when you made a raid about turning anything that was seized over to the federal government?    A. Yes.

"Q. And what information the federal authorities would require in order to obtain a conviction?    A. Yes, sir.

"Q. When was this conference you just spoke of, this school?    A. I don't remember the exact date, either in July or June.

"Q. The latter part of June or the first of July?    A. Yes.

"Q. During the month of July give the court your best recollection of how many cases you turned over to the federal authorities here?    A. Well, during July. I judge, to the best of my knowledge, there was right close to 200 or 250 during that month.

"Q. During July. Now, during August what would be your best estimate that you as head of the raiding squad turned over to the federal officer for violation of the Volstead Act?    A. I believe I counted the cases of violations of the prohibition act. I couldn't say they were all brought up here, but there was, to my best knowledge, I think, right close to 500 cases.

"The Court: You mean August alone or in July and August?    A. July and August. There was a short time there that the federal authorities were in St. Joe. They held court in other places, and we didn't bring any cases here at that time."

## Cross-examination:

"Q. Were you familiar with the terms of the National Prohibition Act? A. No, sir; I was not.

"Q. And in the conversation or visit you made down at the Federal Building here what was your purpose in coming?    A. To get instructions along that line.

"Q. To learn what the law was and get instructions?    A. Yes.

"Q. Now were you at that time tendered the assistance of any federal officers or anything like that?    A. No; not at that time.

"Q. The discussion there was simply as to the Volstead Act and its provisions and enforcement?    A. Yes."

## Redirect examination:

"Q. When you made an arrest, after having raided a place and found there evidence of what you thought was a violation of the Volstead Act, what was the procedure by which the arrested person found his way from the hands of the police department into the hands of the federal officers? A. Well, we brought them up here and turned them over to the prohibition officers.

"Q. You mean here at the Federal Building?    A. Yes, sir; and the prohibition officers took the facts in the case and they were filed on, or brought before the commissioner.

"The Court: And if they were discharged, weren't held by the federal authorities, what was done?    A. They were released. After we turned them over to the federal authorities, if they didn't file on them, they were released.

"Q. Did you ever turn any of those things over to the federal authorities along with the prisoners?    A. We used to bring a sample of the liquor up here.

"Q. Did you get out any search warrants to make these raids?    A. No, sir."

Byron H. Coon, Esq., called as a witness on behalf of the government, testified that he was the assistant United States district attorney

mentioned in the testimony; that he met one evening in the district attorney's office several of the officers who were especially looking after violations of the state liquor law and were members of the police department of Kansas City. Attention was called especially to the fact that arrests and prosecution of liquor violations in the state courts would be of benefit in two ways; it would tend to decrease the number of cases before the commissioner, and would lay the foundation for prosecution by way of injunction, if any of the defendants who were convicted in the state court were afterwards apprehended by any federal officers. He thought that remedy would be effective and tend to reduce the number of prosecutions which came before this court. At that time the different provisions of the Volstead Act were gone over, and it was just a general discussion of the law as he understood it at that time.

Cross-examination:

"Q. You were not discussing questions of injunction with the police officers. were you. Mr. Coon? A. I believe that at that time I mentioned the fact that arrests that they made, and convictions that resulted therefrom in the state court, would be of advantage if the federal officers had occasion to arrest the same party; and I would say further now that I called their attention to the fact that I believed that arrests by state officers and convictions in state courts would be also beneficial in prosecutions that might be instituted on the charge of maintaining a nuisance. * * * That conference, I want you to understand now, wasn't had or any discussion entered into there with a view of increasing the business in the federal court here.

"Q. Well, didn't you tell them where their evidence had been short before that—where additional evidence was necessary? A. We probably discussed what would be a complete case.

"Q. And if they expected to get any conviction in this court what they would have to produce? A. I didn't put it on that basis; no, sir.

"Q. Wasn't your object more particularly to inform them as to what evidence would be necessary to be able to obtain convictions? A. No, sir; my idea was to stimulate prosecution of liquor cases under the state law in the state courts, and that prosecution so had there would be of benefit on the nuisance charge. * * * It wasn't with any view of making them part of any federal agency. I didn't have that in view. * * * I know I mentioned the fact that convictions in the state court, if had before, would be of advantage in the case we prosecuted here against the same defendant on a nuisance charge, and that, if they were prosecuted in the state court to conviction, the record therein made would be of advantage here. The different terms of the Volstead Act were read to them."

Officer E. R. Thornton testified that he arrested Falloco, and that the prisoner and whisky were turned over to the federal authorities. He had received no instructions from the federal authorities prior to that time with reference to this particular case. In the first instance he reported to his superior officer at the city hall in the police department.

"Q. After reporting there what was the next thing you did? A. Well, that was all we did right away. I am not sure, but I believe that was on Sunday. The next day, of course, we brought the man up to the government."

Officer Hammond testified that he arrested the defendant Ross.

"Q. What did you do with him? A. Took him to No. 4, and from there to No. 1, and from there up here:

"Q. You turned him over to Mr. Dunnigan, federal prohibition agent? A. Yes, sir.

"Q. And they filed a complaint against him to appear before Commissioner Beardsley? A. Yes, sir.

"Q. You have arrested a great many people for violation of the Volstead Act? A. Yes, sir.

"Q. And all those people have been brought up here and turned over to Mr. Dunnigan? A. Not all of them.

"Q. Where you thought you had enough evidence to convict under the Volstead Act, you brought them up here? A. We took some of them to the state authorities, if they couldn't handle them up here.

"Q. You brought them up here first? A. We brought them here first."

Sergeant Withrow testified as follows:

"Q. What did you do with Ross? A. Arrested him and took him to No. 4 station.

"Q. Then what did you do? A. Booked him for investigation and sent him to No. 1.

"Q. Then what? A. The officers took him out the next morning to the government."

Frank Anderson testified as follows:

"Q. What do you have to do with prisoners who are taken by the police department, where you find evidence which in the opinion of the department might tend to convict them of violations of the Volstead Act? A. I book the prisoners and get the evidence from the officers for trial the next day and take care of the evidence.

"Q. What do you do with respect to turning them over to the federal officers? A. The next morning we turn them over, according to what the case is, to the federal court: that is, the prohibition agents, we send them up there, and if they can't handle them, we send them to the state.

"Q. That has been the regular practice of the police department for how long a time? A. Ever since the Volstead Act has been in effect.

Q. Is that regardless of whether or not searches or seizures in such cases have been made with or without search warrants? A. We work according to the laws of the State of Missouri in these searches. If the case is so it could be put into the government's hands, we send it over here.

"Q. How many cases have you turned over to the federal government in this way during the last six months? A. Six or seven hundred."

[1, 2] It must be conceded that the Fourth Amendment to the Constitution of the United States is not directed to individual conduct of state officials. Its limitations reach only the federal government and its agencies. The police officers of this state may make arrests for violation of the prohibitory law by virtue of the authority vested in them under the enforcement act of this state, which runs concurrently with the federal enactment known as the Volstead Act. In so doing they act as state officers, and, though their procedure may not accord with that required and guaranteed by the fundamental law in the federal jurisdiction, nevertheless the evidence they procure, if otherwise competent and material, may be used in prosecutions in a federal jurisdiction if it comes to the knowledge of the federal prosecuting officer. But, as has been said by the Supreme Court, and in the lesser federal courts, the alleged unlawful search and seizure must not be made by, or under the direction of, any officer of the United States.

As was said in United States v. Burnside (D. C.) 273 Fed. loc. cit. 605:

277 F.—6

"The United States had no part in securing the search warrants in question, nor in executing the same. The proceedings were carried on by the police officers of the city of Superior prior to the time when any proceedings were taken by the United States government, and it appears from the testimony taken in connection with this application that the proceedings by the city officers were entirely independent of the United States government or any of its agents, and that it was some time after the search had been executed and the liquor seized that the police officers of the city of Superior deliveerd the liquor so seized to the United States Attorney for use as evidence in the pending proceeding."

Merely because the jurisdictions are concurrent and that the subject-matter of the offense is identical, that, in fact, the two enforcement jurisdictions overlap, and that one jurisdiction may, if it sees fit, turn an offender over to the other for prosecution, all this is insufficient, standing by itself, to charge the officers and courts of the United States with excess of authority, if that be found to exist, on the part of state officers. The evidence thus secured, if pertinent, may be used.

[3] I am convinced, upon careful analysis, that the relationship between the state and federal officers in the cases at bar was such as to take these cases out of the rule just stated. There were conferences between state and federal authorities. Those conferences were held with a view to a closer co-operation between the two jurisdictions in the enforcement of the prohibitory law. Our attention here is confined to the situation shown to exist during a restricted period, to wit, the months of July and August of last summer. It is true undoubtedly, as suggested, that in the minds of the federal officers there was no purpose of expanding the federal jurisdiction, and bringing a greater flood of cases to the federal court. It is true that they had not in mind the use of unconstitutional summary methods of securing evidence, and that they desired greater activity in the way of prosecutions in the jurisdictions of the state; nevertheless the effect of these conferences was to stimulate activity on the part of the state authorities, with the objective of a more effective enforcement of the Volstead Act. The resulting procedure, whatever the underlying motive, was that, during the limited period referred to, the great majority of prosecutions in the federal court were initiated by the police officers of the state; that the violations in which arrests were made were brought, and intended to be brought, immediately to the federal court, and were not intended to be, and were not, taken to the state court, except, perhaps, in very exceptional cases, unless the federal authorities declined to take cognizance of them. On the other hand, the enforcement officers of the government understood this, acquiesced in it, and acted in accordance with this tacit, if not express, understanding. Those arrested one day were brought regularly to the federal court on the following morning. The procedure was systematic and frictionless.

[4] Under such circumstances, I do not think it necessary to show that the officers of the government had special knowledge, or issued special directions, in each specific case. If we were to ignore this circuitous, uninterrupted, but substantial evasion of the Fourth Amendment to the Constitution of the United States, even though that evasion was unconscious and unstudied, we should countenance a depar-

ture from the spirit of our fundamental law more harmful in its far-reaching effects than the evil here sought to be remedied. Nothing herein said is to be construed as a surrender of the right of the government to avail itself, without stint, of evidence incidentally secured by state officers under the rules, principles and conditions announced by the Supreme Court and other courts of the United States. I simply hold that, under the situation here presented by the record, the police officers in the cases at bar were so far recognized agencies of the government in the enforcement of the prohibitory law that their acts must be governed by the limitations imposed by the federal Constitution. This being so, the applications of the defendants, Falloco and Ross, must be sustained.