59 So.2d 403

## STATE v. MASTRICOVO.
### No. 40529.

April 28, 1952.

Rehearing Denied June 2, 1952.

G. Wray Gill, Alex W. Swords, New Orleans, for defendant-appellant.

Bolivar E. Kemp, Jr., Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Severn T. Darden, Dist. Atty., Phil Trice, Asst. Dist. Atty., New Orleans, for appellee.

MOISE, Justice.

Frank Mastricovo was convicted of violating LSA–R.S. 40:962, in that he had in his possession, illegally, eleven ounces of heroin; and pleading guilty as a double

offender, he was sentenced to serve ten years at hard labor in the Louisiana State Penitentiary. His appeal presents for our consideration ten bills of exception, which will be discussed in four groups.

Bills I and II were reserved to the Court's denial of a motion to quash and motion to dismiss and suppress, both of which were based upon identical allegations that essential evidence was obtained by means of an illegal search and seizure.

The record discloses the following facts anent this charge:

Mastricovo was arrested on July 8, 1950, on the sidewalk outside his place of business, which was thereupon immediately searched but which failed to yield any narcotics. The Narcotic Squad of the Police Department of the City of New Orleans then compelled him to accompany them to his apartment, at 540 Dumaine Street (second floor). No narcotics were found in the apartment itself, but the officers discovered two delicate scales of the type used to weigh out heroin and the milk sugar with which it is "cut" for distribution to addicts, and also a number of small envelopes. An obvious trail led from the apartment up the two flights of dusty stairs to the third floor and fourth floor attic (both unoccupied). On the third floor the officers found more envelopes of the same type as those previously discovered in the second floor apartment, and on the fourth floor they found 11 ounces of heroin compound (consisting of 57% heroin and 43%

milk sugar), worth $150,000 in the narcotic market. Defendant contends that such seizure was an independent act, not incidental to his arrest, and that his rights under both the Federal and State Constitutions were violated, that the evidence was therefore illegal and should have been suppressed, and consequently, the bill of information dismissed, since the evidence thus obtained formed the only basis of the charge. Defendant makes the additional contention that the raid having been made under the direction of the Federal Bureau of Narcotics and its chief agent, the police officers were for the purpose of that raid, quasi Federal Narcotic Agents, and that no prosecution could lie under the Federal statutes in the absence of a search warrant, and the lack thereof renders the entire proceeding, both seizure and arrest, null and void in its incipiency.

There is no merit to either of these bills. The jurisprudence of this state is settled beyond any question that relevant evidence, although seized without a search warrant, is none the less admissible. State v. Shotts, 207 La. 898, 22 So.2d 209; State v. Alvarez, 182 La. 908, 162 So. 725; State v. Eddins, 161 La. 240, 108 So. 468; State v. Davis, 154 La. 405, 97 So. 590; State v. Lowry, 153 La. 177, 95 So. 596; State v. Mims, 153 La. 9, 95 So. 264; State v. Fleckinger, 152 La. 337, 93 So. 115; City of Shreveport v. Marx, 148 La. 31, 86 So. 602. It matters not that an agent of the Federal Bureau of Narcotics accompanied

these arresting officers; accused was tried in a State court for violating a statute of the State of Louisiana, and the fact that the offense might also violate a Federal statute on the same subject has no bearing on the circumstances.

Bills III, IV, V, VI, VII and VIII relate to the refusal of the trial court to permit evidence that defendant was beaten by the police after his arrest. The sequence of events after the discovery of the heroin outlined supra is as follows: Defendant and his wife were confronted therewith, and defendant made a confession of ownership. He, his wife, and their nine-year old daughter were then taken to the Office of the Bureau of Narcotics, United States Treasury Department, Federal Building, New Orleans. Mrs. Mastricovo and the child were later released and defendant removed to the office of the Superintendent of Police, City of New Orleans; while there, he alleges that he was mistreated and beaten so severely that he made a written confession, admitting ownership of said narcotics. He also contends that the oral confession made at his domicile had not been voluntarily made, but had been made because of the inducement offered by some of the arresting officers to free defendant's wife and child, were he to confess; and he argues that there was highly prejudicial error in not permitting him to cross-examine the respective arresting officers with respect to the eliciting of the verbal confession.

There is no merit to these bills. The prosecution made no attempt to use the written confession which had been obtained after defendant's remand to the custody of the New Orleans Police Department. The only confession which it sought to introduce was the verbal confession made by defendant at his home. The trial judge held "that the testimony [as to beatings of accused after he had left his house] was irrelevant and immaterial to any of the issues in this case", since they had not been part of a continuous action. However, he ruled out the introduction of even the verbal confession after hearing all the testimony adduced in connection with accused's objections thereto (the jury having been retired in each instance), being convinced that an inducement had been made, if not by one of the arresting officers, then by the Federal agent who accompanied them. The jury proceeded to convict the accused upon circumstantial evidence. It is obvious from the exhaustive per curiam of the judge a quo that careful consideration was given to the testimony of the witnesses before permission to place it before the jury was refused, and we find no error in the rulings complained of:

"As part of its predicate to the offer of its confession, the state placed the arresting officers upon the witness stand who testified in effect, that the defendant had made a verbal confession as to his ownership of the narcotics. This confession they asserted, was made at

the home of defendant in the presence of his wife, at the time the narcotic cache was discovered and at the time of his arrest. Each in turn testified that no force, violence, threats or duress were used to extort the confession from him, nor was any promise, immunity, hope or reward held out to him to confess.

"Both defendant and his wife admitted, that the defendant did confess to the ownership of narcotics at their home at the time of the discovery by the police of the narcotics, and his arrest. Both admit that no physical violence, or threat of same, was used by the arresting officers, to bring about defendant's confession. However, both defendant and his wife swore, that several of the arresting officers, did threaten to jail defendant's wife and charge her with the joint possession of the narcotics, and further that they would place their minor child in an institution, if he, the defendant, did not confess to the possession of the narcotics found by the police. Both testified, it was then that the defendant admitted ownership of the narcotics. Defendant further testified, that while he did at that time, claim the ownership of the narcotics, he did so only because of the threat to the liberty of his wife and child, and that the statement of ownership so made by him, was not true. * * *

"The court throughout all of this inquiry held fast to the proposition, that as the state in its opening had said it would seek to offer a verbal confession made at the home of defendant at the time of his arrest, whether or not he had been beaten thereafter, possibly in an effort to extort a written confession, or to elicit further information, was immaterial to the issue. The court further held, that if defendant could or would show that the defendant had been beaten before the making of the verbal confession at his home at the time of the arrest, that the court would permit testimony of any brutal treatment thereafter, as evidence of a continuous course of conduct, and as it might tend to give credence to similar conduct prior to the time the verbal confession is alleged to have been made at the home of defendant at the time of the arrest and seizure of the narcotics. * * *

"After the matter had been submitted for the court's adjudication, the court ruled out the confession made by defendant at his home at the time of his arrest, and declined to permit same to be heard by the jury.

"The court's reasons for ruling out said confession appear below.

" 'The burden of proof beyond a reasonable doubt as to the free and voluntary character of the alleged statement or confession rests with the state. It is its obligation to prove to the satisfaction of the court as it is its obligation

to prove all factual elements of the case, whether to the court or to the jury, beyond a reasonable doubt. Therefore, it is the affirmative obligation and duty of the state to convince the court before the alleged statement or admission of guilt is admissible and may go to the jury. Has the state discharged that burden?

" 'Of the fact that the defendant is alleged to have made a statement at the house, there seems to be no dispute. The state contends that he did make a statement. The state with a great deal of vehemence, vigor and energy attempts to offer that statement as an admission or confession of guilt.

" 'The defendant on trial testifies that he did make a statement. I don't know what the statement is. I have never heard it. It is obvious that the intention of defendant was to admit that it was his, just as I assume that the state was going to show that he said it was his, and the state is a little confused in the court's opinion by the attempt of the defendant to testify in his illiterate way, that, "Yes, I confessed, but I deny that the confession was true." That is what I get from the total testimony of the defendant. "Yes, I admit that I said it was mine, but I deny that it was mine. My reason for so confessing was to absolve my wife and child from being taken into custody." That is the

way I understand the issue. Has the state sustained that issue?

" 'Two police officers have been placed upon the witness stand to testify as to the circumstances surrounding the arrest and the circumstances concomitant upon or part of the alleged confession.

In each instance, both of them—all three of them testified that they individually did not make any such threat, but neither one of them admit that they ever heard anybody say so. They do not affirmatively say that this was not discussed. That may appear tweedle-dee and tweedledum to the average uninitiated man; but they would never at any time pin themselves down to say that it was not said or discussed. As far as they would go is, that they did not make any such offer or promise or threat, but they didn't hear it made. * * *

" 'Now, what are the ultimate results of the different contentions made by each side. Of the fact that Mrs. Mastricovo was ultimately released that day, there is no denial. It is true that she may or may not have been conscious of the fact that this contraband and narcotics was in the possession of her husband or was in the joint possession of both of them. The fact of the matter remains that she was actually released at the end of that day, when she might just as well been jointly charged with him, and the state call the Federal government in and

have both of them charged, with the idea of placing them jointly on trial, and for somebody to do the gentleman-ly act and take the fall for himself. Whether the state was motivated—when I say the state I mean the police department—was motivated by kind-ness or by some good motive as regards the child, I don't know; but I know that there was no greater temptation for the wife and child for the husband about to be taken away, to induce him to accept full responsibility, which is perfectly correct. I am only making this observation, as a judge, not as a juror, to absolve the wife. * * *

" 'It is not a question whether he had taken responsibility and denies it after-wards. Was there any inducement, ei-ther in the form of a threat or in some-thing he was to gain, or something his loved ones were to gain by reason of the inducement? That is the only ques-tion involved. Whether or not his statement was true or false is not a question at issue before the court.

" 'Now, whether or not this man was induced to make that statement which he alleges he made at the house, or whether he made it ultimately at the Federal post office building, with the idea of freeing his wife, I am just a lit-tle bit uncertain, I don't know. * * *

" 'I think the defense has created a rea-sonable doubt in the court's mind as to whether these police officers, or Mr.

Richards (the Federal Narcotics Agent) or all of them, didn't offer this inducement; and having been con-vinced that an inducement was made, the court will not permit the confession in evidence.'

"The court upon the jury's return to the box then made the following state-ment to the jury.

" 'Gentlemen, during the case in the opening statement made by the state, or during the taking of evidence on the preliminary character of the alleged statement or confession, you have heard that a statement or confession might or might not be tendered.

" 'The ruling of the court has been— in your absence I have been hearing all the testimony—that if there was a statement or confession of guilt made, in the court's opinion—that is a matter that addresses itself to the court and the court alone—that the statement or confession was not freely and voluntar-ily made and therefore you should not hear it.

" 'Now, gentlemen, that ends the mat-ter. You are to pay no attention what-soever to any testimony upon which a predicate may have been tendered as to the alleged voluntary character of the statement or confession. You decide the case ultimately upon the evidence that you have heard, and not specula-tion on what you might have heard and did not hear. Do I make that clear?' "

We fail to see how, under these circumstances, the mere mention by the State in its opening statement that it expected to use a verbal confession, without any details being given, could have operated to the prejudice of the accused; if anything, such defenses as he could interpose to this prosecution were strengthened by the refusal of the court to permit its introduction in evidence.

██ Bill IX was reserved to the overruling of defendant's objection to the following question propounded by the State to his wife, under cross-examination:

"Q. At the time the officers were searching the place and found these scales and asked for what purpose they were used, that your child said, 'Papa weighs sugar on these scales,' at which time you slapped the child and told her not to answer?"

The witness ultimately answered the question thus:

"A. No. I did not. I told my child to play with her little sewing machine that she had before her."

Defense counsel based his objection on two grounds: (1) that the supposed incident had not been covered in the opening statement, and (2) that the inquiry was not pertinent, that "the child was not here" [at the trial.] The per curiam points out that mention of the scales had been made in the opening statement, from which it quotes, and further, that before the question had been asked, there had already been testimony to the effect that the scales found in defendant's kitchen were of the type used by those engaged in the narcotic traffic to weigh extremely small amounts of heroin and milk sugar. The incident was part and parcel of the res gestae of the arrest and was relevant and material. The state was at liberty to show this witness' bias, interest or corruption. Art. 492, Code of Criminal Procedure; LSA–R.S. 15:492. State v. Graziani, 168 La. 297, 121 So. 872.

██ Bill X was reserved to the overruling of accused's motion for a new trial. The motion reiterates the reservations of the first nine bills, and urges additionally that though counsel did his best for defendant at the time of the trial, due to counsel's poor health defendant's case suffered. The granting of a new trial upon such a plea is largely within the discretion of the trial judge, who has had the opportunity to observe the appearance and behavior of the active participants in the case, and in this instance, the professional competence of counsel. As to the latter, he states:

"While it is true that defendant's counsel Mr. G. Wray Gill did become ill some time after the verdict was returned in the instant case, the court is convinced that the defendant suffered no injury because of this illness. The defendant at the hands of Mr. Gill received an intelligent and vigorous defense. At no time during the trial or before, did Mr. Gill inform the court of

any indisposition. As a matter of fact, Mr. Gill was, at all times during the trial, his usual buoyant, gracious and vigorous self. He was assisted throughout the trial by Mr. Alex W. Swords, an active and intelligent trial lawyer. The court is certain that Mr. Gill's illness developed some time after the trial of this case, and that same in no way affected his professional duties in his representation of the defendant in the case at bar."

On reviewing the record, the court is of the opinion that counsel used every argument and employed every defense tactic available; and we find no reason to disa· gree with the trial judge's disposition of the motion for new trial.

One other matter addresses itself to our attention in connection with this appeal. This case was tried on March 20, 1951; the verdict of guilty was returned, after a tenminute deliberation, at 12:25 A.M., March 21, 1951; sentence was pronounced on June 27, 1951, and the motion for suspensive appeal ordered returnable on August 22, 1951. The transcript was filed in this court on August 17, 1951. Sometime in November, 1951, the court stenographer who had taken down the testimony in the trial court died. On January 7, 1952, defense counsel moved to have the testimony transcribed in its entirety, i. e., in addition to the transcript of evidence which had been incorporated in the ten bills of exception and already included in the record, all the remaining un-

transcribed shorthand notes of the deceased court stenographer. The notes being undecipherable by anyone else, and counsel urging that it was necessary for the entire testimony to be before this court, the effect of granting the motion would have been to grant a new trial. It is noted that even at the time said motion was filed, the appeal had already been docketed for argument in this court on January 25, 1952. The motion was denied, and a bill· of exception reserved to the denial.

We find no error in the ruling complained of. Bills I and II in the original transcript were signed on June 19, 1951; the others were signed on June 22, 1951, and the per curiams were also signed on that date. The judgment rendered on the rule to show cause why the transcript should not be amended and completed states that defense counsel had had numerous conferences with said stenographer as to what testimony he desired transcribed for the purpose of preparing and presenting the formal bills reserved during the trial, that in each instance where request was made for the transcription of testimony, it was readily complied with, and that counsel at no time requested transcription of the entire testimony from the stenographer. While it is true that counsel, in connection with each respective bill, made the entire testimony of the case a part thereof, the burden was upon him to annex it and incorporate it in the formal bill, since that it is the only manner in which this court can consider evidence in

criminal cases. LSA–R.S. 15:555, Article 555, Code of Criminal Procedure; State v. Lecompte, 214 La. 117, 36 So.2d 695; State v. Russell, 167 La. 1010, 120 So. 629; State v. Goodson, 116 La. 388, 40 So. 771.

The verdict and sentence are affirmed.

FOURNET, C. J., absent.