ELKINS ET AL. *v.* UNITED STATES.

No. 126. Argued March 28–29, 1960.—Decided June 27, 1960.

*Frederick Bernays Wiener* argued the cause for petitioners. With him on the brief was *Walter H. Evans, Jr.*

*Assistant Attorney General Wilkey* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Beatrice Rosenberg* and *Eugene L. Grimm.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners were indicted in the United States District Court in Oregon for the offense of intercepting and divulging telephone communications and of conspiracy to do so. 47 U. S. C. §§ 501, 605; 18 U. S. C. § 371. Before trial the petitioners made a motion to suppress as evidence several tape and wire recordings and

a recording machine, which had originally been seized by state law enforcement officers in the home of petitioner Clark under circumstances which, two Oregon courts had found, had rendered the search and seizure unlawful.[1] At the hearing on the motion the district judge assumed without deciding that the articles had been obtained as the result of an unreasonable search and seizure, but denied the motion to suppress because there was no evidence that any "agent of the United States had any knowledge or information or suspicion of any kind that this search was being contemplated or was eventually made by the State officers until they read about it in the newspaper." At the trial the articles in question were admitted in evidence against the petitioners, and they were convicted.

---

[1] The state officers, having received information that petitioners had in their possession obscene motion pictures, procured a search warrant to search petitioner Clark's home. The affidavit upon which the warrant was based recited that "upon information and belief" it was thought that Clark possessed obscene pictures and accompanying sound recordings. The search revealed no obscene pictures, but various paraphernalia believed to have been used in making wiretaps were found and seized.

Following an appropriate motion, the Multnomah County District Court held the search warrant invalid and ordered suppression of the evidence. This action came, however, after the return of an indictment by a state grand jury, and the local district attorney challenged the power of the district court to suppress evidence once an indictment was in. Accordingly, the question was later argued anew on a motion to suppress in the Circuit Court for Multnomah County, a court of general criminal jurisdiction. That court held the search unlawful and granted the motion to suppress. The state indictment was subsequently dismissed.

During the course of these state proceedings federal officers, acting under a federal search warrant, obtained the articles from the safe-deposit box of a local bank where the state officials had placed them. Shortly after the state case was abandoned, a federal indictment was returned, and the instant prosecution followed.

The convictions were affirmed by the Court of Appeals for the Ninth Circuit, 266 F. 2d 588. That court agreed with the district judge that it was unnecessary to determine whether or not the original state search and seizure had been lawful, because there had been no participation by federal officers. "Hence the unlawfulness of the State search and seizure, if indeed they were unlawful, did not entitle defendants to an order of the District Court suppressing the property seized." 266 F. 2d, at 594.

We granted certiorari, 361 U. S. 810, to consider a question of importance in the administration of federal justice. The question is this: May articles obtained as the result of an unreasonable search and seizure by state officers, without involvement of federal officers, be introduced in evidence against a defendant over his timely objection in a federal criminal trial? In a word, we re-examine here the validity of what has come to be called the silver platter doctrine.[2] For the reasons that follow we conclude that this doctrine can no longer be accepted.

To put the issue in historic perspective, the appropriate starting point must be *Weeks* v. *United States,* 232 U. S.

---

[2] The "silver platter" label stems from a phrase first turned in the prevailing opinion in *Lustig* v. *United States,* 338 U. S. 74, 79. The doctrine has been the subject of much comment in legal periodicals. See, *e. g.,* Allen, The Wolf Case: Search and Seizure, Federalism, and the Civil Liberties, 45 Ill. L. Rev. 1, 14–25; Galler, The Exclusion of Illegal State Evidence in Federal Courts, 49 J. Crim. L., Criminology & Police Science 455; Kohn, Admissibility in Federal Court of Evidence Illegally Seized by State Officers, 1959 Wash. U. L. Q. 229; Kamisar, *Wolf* and *Lustig* Ten Years Later: Illegal State Evidence in State and Federal Courts, 43 Minn. L. Rev. 1083; Parsons, State-Federal Crossfire in Search and Seizure and Self Incrimination, 42 Cornell L. Q. 346, 347–368; Comment, The *Benanti* Case: State Wiretap Evidence and the Federal Exclusionary Rule, 57 Col. L. Rev. 1159; Comment, Judicial Control of Illegal Search and Seizure, 58 Yale L. J. 144; Notes, 51 Col. L. Rev. 128, 27 Geo. Wash. L. Rev. 392, 5 N. Y. L. F. 301, 6 U. C. L. A. Rev. 703.

383, decided in 1914. It was there that the Court established the rule which excludes in a federal criminal prosecution evidence obtained by federal agents in violation of the defendant's Fourth Amendment rights. The foundation for that decision was set out in forthright words:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

. . . . .

". . . If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts

of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." 232 U. S. 383, 391–393.

To the exclusionary rule of *Weeks* v. *United States* there has been unquestioning adherence for now almost half a century. See *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298; *Amos* v. *United States,* 255 U. S. 313; *Agnello* v. *United States,* 269 U. S. 20; *Go-Bart Co.* v. *United States,* 282 U. S. 344; *Grau* v. *United States,* 287 U. S. 124; *McDonald* v. *United States,* 335 U. S. 451; *United States* v. *Jeffers,* 342 U. S. 48.

But the *Weeks* case also announced, unobtrusively but nonetheless definitely, another evidentiary rule. Some of the articles used as evidence against Weeks had been unlawfully seized by local police officers acting on their own account. The Court held that the admission of this evidence was not error for the reason that "the Fourth Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal Government and its agencies." 232 U. S., at 398. Despite the limited discussion of this second ruling in the *Weeks* opinion, the right of the prosecutor in a federal criminal trial to avail himself of evidence unlawfully seized by state officers apparently went unquestioned for the next thirty-five years. See, *e. g., Byars* v. *United States,* 273 U. S. 28, 33; *Feldman* v. *United States,* 322 U. S. 487, 492.[3]

---

[3] See, *e. g., Rettich* v. *United States,* 84 F. 2d 118 (C. A. 1st Cir.); *Milburne* v. *United States,* 77 F. 2d 310 (C. A. 2d Cir.); *Miller* v. *United States,* 50 F. 2d 505 (C. A. 3d Cir.); *Riggs* v. *United States,* 299 Fed. 273 (C. A. 4th Cir.); *Timonen* v. *United States,* 286 Fed. 935 (C. A. 6th Cir.); *Fowler* v. *United States,* 62 F. 2d 656 (C. A. 7th Cir.) (dictum); *Elam* v. *United States,* 7 F. 2d 887 (C. A. 8th

That such a rule would engender practical difficulties in an era of expanding federal criminal jurisdiction could not, perhaps, have been foreseen. In any event the difficulties soon appeared. They arose from the entirely commendable practice of state and federal agents to cooperate with each other in the investigation and detection of criminal activity. When in a federal criminal prosecution evidence which had been illegally seized by state officers was sought to be introduced, the question inevitably arose whether there had been such participation by federal agents in the search and seizure as to make applicable the exclusionary rule of *Weeks.* See *Flagg* v. *United States,* 233 Fed. 481, 483; *United States* v. *Slusser,* 270 Fed. 818, 820; *United States* v. *Falloco,* 277 Fed. 75, 82; *Legman* v. *United States,* 295 Fed. 474, 476–478; *Marron* v. *United States,* 8 F. 2d 251, 259; *United States* v. *Brown,* 8 F. 2d 630, 631.

This Court first came to grips with the problem in *Byars* v. *United States,* 273 U. S. 28. There it was held that when the participation of the federal agent in the search was "under color of his federal office" and the search "in substance and effect was a joint operation of the local and federal officers," then the evidence must be excluded, because "the effect is the same as though [the federal agent] had engaged in the undertaking as one exclusively his own." 273 U. S., at 33. In *Gambino* v. *United States,* 275 U. S. 310, the Court went further. There state officers had seized liquor from the defendants' automobile after an unlawful search in which no federal officers had participated. The liquor was admitted in evidence against the defendants in their subsequent federal trial for violation of the National Prohibition Act. This

Cir.)'; *Brown* v. *United States,* 12 F. 2d 926 (C. A. 9th Cir.); *Gilbert* v. *United States,* 163 F. 2d 325 (C. A. 10th Cir.); *Shelton* v. *United States,* 83 U. S. App. D. C. 257, 169 F. 2d 665, overruled by *Hanna* v. *United States,* 104 U. S. App. D. C. 205, 260 F. 2d 723.

Court reversed the judgments of conviction, holding that the illegally seized evidence should have been excluded. Pointing out that there was "no suggestion that the defendants were committing, at the time of the arrest, search and seizure, any state offense; or that they had done so in the past; or that the [state] troopers believed that they had," the Court found that "[t]he wrongful arrest, search and seizure were made solely on behalf of the United States." 275 U. S., at 314, 316.

Despite these decisions, or perhaps because of them, cases kept arising in which the federal courts were faced with determining whether there had been such participation by federal officers in a lawless state search as to make inadmissible in evidence that which had been seized. And it is fair to say that in their approach to this recurring question, no less than in their disposition of concrete cases, the federal courts did not find themselves in complete harmony, nor even internally self-consistent.[4] No less difficulty was experienced by the courts in determining whether, even in the absence of actual participation by federal agents, the state officers' illegal search and seizure had nevertheless been made "solely on behalf of the United States." [5]

But difficult and unpredictable as may have been their application to concrete cases, the controlling principles seemed clear up to 1949. Evidence which had been seized by federal officers in violation of the Fourth Amendment

---

[4] Compare *Sutherland* v. *United States*, 92 F. 2d 305 (C. A. 4th Cir.) ; *Ward* v. *United States*, 96 F. 2d 189 (C. A. 5th Cir.) ; *Fowler* v. *United States*, 62 F. 2d 656 (C. A. 7th Cir.) ; *United States* v. *Butler*, 156 F. 2d 897 (C. A. 10th Cir.) ; with *Kitt* v. *United States*, 132 F. 2d 920 (C. A. 4th Cir.) ; *Sloane* v. *United States*, 47 F. 2d 889 (C. A. 10th Cir.).

[5] Compare *United States* v. *Jankowski*, 28 F. 2d 800 (C. A. 2d Cir.) ; *Marsh* v. *United States*, 29 F. 2d 172 (C. A. 2d Cir.) ; with *United States* v. *Butler*, 156 F. 2d 897 (C. A. 10th Cir.).

could not be used in a federal criminal prosecution. Evidence which had been obtained by state agents in an unreasonable search and seizure was admissible, because, as *Weeks* had pointed out, the Fourth Amendment was not "directed to" the "misconduct of such officials." But if federal agents had participated in an unreasonable search and seizure by state officers, or if the state officers had acted solely on behalf of the United States, the evidence was not admissible in a federal prosecution.

Then came *Wolf* v. *Colorado,* 338 U. S. 25. With the ultimate determination in *Wolf*—that the Due Process Clause of the Fourteenth Amendment does not itself require state courts to adopt the exclusionary rule with respect to evidence illegally seized by state agents—we are not here directly concerned. But nothing could be of greater relevance to the present inquiry than the underlying constitutional doctrine which *Wolf* established. For there it was unequivocally determined by a unanimous Court that the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers. "The security of one's privacy against arbitrary intrusion by the police . . . is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." 338 U. S. 25, 27–28. The Court has subsequently found frequent occasion to reiterate this statement from *Wolf.* See *Stefanelli* v. *Minard,* 342 U. S. 117, 119; *Irvine* v. *California,* 347 U. S. 128, 132; *Frank* v. *Maryland,* 359 U. S. 360, 362–363.

The foundation upon which the admissibility of state-seized evidence in a federal trial originally rested—that unreasonable state searches did not violate the Federal Constitution—thus disappeared in 1949. This removal of the doctrinal underpinning for the admissibility rule has apparently escaped the attention of most of the federal courts, which have continued to approve the admission of

evidence illegally seized by state officers without so much as even discussing the impact of *Wolf*.[6] Only two of the courts of appeals which have adhered to the admissibility rule appear to have recognized that *Wolf* casts doubt upon its continuing validity. *Jones* v. *United States,* 217 F. 2d 381 (C. A. 8th Cir.); *United States* v. *Benanti,* 244 F. 2d 389 (C. A. 2d Cir.), reversed on other grounds, 355 U. S. 96. Cf. *Kendall* v. *United States,* 272 F. 2d 163, 165 (C. A. 5th Cir.). The Court of Appeals for the District of Columbia has been alone in squarely holding "that the Weeks and the Wolf decisions, considered together, make all evidence obtained by unconstitutional search and seizure unacceptable in federal courts." *Hanna* v. *United States,* 104 U. S. App. D. C. 205, 209, 260 F. 2d 723, 727.

Yet this Court's awareness that the constitutional doctrine of *Wolf* operated to undermine the logical foundation of the *Weeks* admissibility rule has been manifest from the very day that *Wolf* was decided. In *Lustig* v. *United States,* 338 U. S. 74, decided that day, the prevailing opinion carefully left open the question of the continuing validity of the admissibility rule. "Where there is participation on the part of federal officers," the opinion said, "it is not necessary to consider what would be the result if the search had been conducted entirely by State officers." 338 U. S., at 79. And in *Benanti* v. *United States,* 355 U. S. 96, the Court was at pains to point out that "[i]t has remained an open question in this Court whether evidence obtained solely by state agents in an illegal search may be admissible in federal court . . . ." 355 U. S., at 102, note 10. There the question has stood for 11 years.

---

[6] See, *e. g., Burford* v. *United States,* 214 F. 2d 124, 125 (C. A. 5th Cir.); *Ford* v. *United States,* 234 F. 2d 835, 837 (C. A. 6th Cir.); *United States* v. *Moses,* 234 F. 2d 124 (C. A. 7th Cir.); *Williams* v. *United States,* 215 F. 2d 695, 696 (C. A. 9th Cir.); *Gallegos* v. *United States,* 237 F. 2d 694, 696–697 (C. A. 10th Cir.).

If resolution of the issue were to be dictated solely by principles of logic, it is clear what our decision would have to be. For surely no distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted equally in either case. To the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer.[7] It would be a curiously ambivalent rule that would require the courts of the United States to differentiate between unconstitutionally seized evidence upon so arbitrary a basis. Such a distinction indeed would appear to reflect an indefensibly selective evaluation of the provisions of the Constitution. Moreover, it would seem logically impossible to justify a policy that would bar from a federal trial what state officers had obtained in violation of a federal statute, yet would admit that which they had seized in violation of the Constitution itself. Cf. *Benanti* v. *United States,* 355 U. S. 96.

---

[7] Long before the Court established that the Fourteenth Amendment protects the security of one's privacy against arbitrary intrusion by state officers, Mr. Justice (then Judge) Cardozo perceived a basic incongruity in a rule which excludes evidence unlawfully obtained by federal officers, but admits in the same court evidence unlawfully obtained by state agents. "The Federal rule as it stands is either too strict or too lax. A Federal prosecutor may take no benefit from evidence collected through the trespass of a Federal officer. . . . He does not have to be so scrupulous about evidence brought to him by others. How finely the line is drawn is seen when we recall that marshals in the service of the nation are on one side of it, and police in the service of the States on the other. The nation may keep what the servants of the States supply. . . . We must go farther or not so far. The professed object of the trespass rather than the official character of the trespasser should test the rights of government. . . . A government would be disingenuous, if, in determining the use that should be made of evidence drawn from such a source, it drew a line between them. This would be true whether they had acted in concert or apart." *People* v. *Defore,* 242 N. Y. 13, 22–23, 150 N. E. 585, 588.

Mere logical symmetry and abstract reasoning are perhaps not enough, however, to support a doctrine that would exclude relevant evidence from the trial of a federal criminal case. It is true that there is not involved here an absolute or qualified testimonial privilege such as that accorded a spouse, a patient, or a penitent, which irrevocably bars otherwise admissible evidence because of the *status* of the witness or his relationship to the defendant. Cf. *Hawkins* v. *United States*, 358 U. S. 74. A rule which would exclude evidence if, and only if, government officials in a particular case had chosen to engage in unlawful *conduct* is of a different order. Yet, any apparent limitation upon the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice.

What is here invoked is the Court's supervisory power over the administration of criminal justice in the federal courts, under which the Court has "from the very beginning ·of its history, formulated rules of evidence to be applied in federal criminal prosecutions." *McNabb* v. *United States*, 318 U. S. 332, 341. In devising such evidentiary rules, we are to be governed by "principles of the common law as they may be interpreted . . . in the light of reason and experience." Rule 26, Fed. Rules Crim. Proc. Determination of the issue before us must ultimately depend, therefore, upon evaluation of the exclusionary rule itself in the context here presented.

The exclusionary rule has for decades been the subject of ardent controversy. The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here. Most of what has been said in opposition to the rule was distilled in a single Cardozo sentence—"The criminal is to go free because the constable has blundered." *People* v. *Defore,*

242 N. Y. 13, 21, 150 N. E. 585, 587. The same point was made at somewhat greater length in the often quoted words of Professor Wigmore: "Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else." 8 Wigmore, Evidence (3d ed. 1940), § 2184.

Yet, however felicitous their phrasing, these objections hardly answer the basic postulate of the exclusionary rule itself. The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it. See *Eleuteri* v. *Richman*, 26 N. J. 506, 513, 141 A. 2d 46, 50. Mr. Justice Jackson summed it up well:

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about

which courts do nothing, and about which we never hear.

"Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty." *Brinegar* v. *United States,* 338 U. S. 160, 181 (dissenting opinion).

Empirical statistics are not available to show that the inhabitants of states which follow the exclusionary rule suffer less from lawless searches and seizures than do those of states which admit evidence unlawfully obtained. Since as a practical matter it is never easy to prove a negative, it is hardly likely that conclusive factual data could ever be assembled. For much the same reason, it cannot positively be demonstrated that enforcement of the criminal law is either more or less effective under either rule.

But pragmatic evidence of a sort is not wanting. The federal courts themselves have operated under the exclusionary rule of *Weeks* for almost half a century; yet it has not been suggested either that the Federal Bureau of Investigation has thereby been rendered ineffective, or that the administration of criminal justice in the federal courts has thereby been disrupted.[8] Moreover, the expe-

---

[8] The Director of the Federal Bureau of Investigation has written as follows:

"One of the quickest ways for any law enforcement officer to bring public disrepute upon himself, his organization and the entire profession is to be found guilty of a violation of civil rights. Our people may tolerate many mistakes of both intent and performance, but, with unerring instinct, they know that when any person is intentionally deprived of his constitutional rights those responsible have committed no ordinary offense. A crime of this nature, if subtly encouraged by failure to condemn and punish, certainly leads down the road to totalitarianism.

"Civil rights violations are all the more regrettable because they are so unnecessary. Professional standards in law enforcement pro-

rience of the states is impressive. Not more than half the states continue totally to adhere to the rule that evidence is freely admissible no matter how it was obtained.[9] Most of the others have adopted the exclusionary rule in its entirety; the rest have adopted it in part.[10] The movement towards the rule of exclusion has been halting but seemingly inexorable.[11] Since the *Wolf* decision one state has switched its position in that direction by legislation,[12] and two others by judicial decision.[13] Another state, uncommitted until 1955, in that year adopted the rule

vide for fighting crime with intelligence rather than force. . . . In matters of scientific crime detection, the services of our FBI Laboratory are available to every duly constituted law enforcement officer in the nation. Full use of these and other facilities should make it entirely unnecessary for any officer to feel the need to use dishonorable methods.

"Complete protection of civil rights should be a primary concern of every officer. These rights are basic in the law and our obligation to uphold it leaves no room for any other course of action. Although the great majority in our profession have long since adopted that policy, we cannot yet be entirely proud of our record. Incidents which give justification to charges of civil rights violations by law enforcement officers still occur. . . . This state of affairs ought to be taken as a challenge to all of us. Every progressive police administrator and officer must do everything in his power to bring about such an improvement that our conduct and our record will conclusively prove each of these charges to be false." FBI Law Enforcement Bulletin, September, 1952, pp. 1–2.

[9] See Appendix, *post*, pp. 224–225.

[10] See Appendix, *post*, pp. 224–225.

[11] For a discussion of recent developments in British Commonwealth jurisdictions, see Cowen, The Admissibility of Evidence Procured Through Illegal Searches and Seizures in British Commonwealth Jurisdictions, 5 Vanderbilt L. Rev. 523 (1952). The author concludes upon a survey of Commonwealth decisions "that there is no uniform rule on the admissibility of evidence procured through illegal searches and seizures." *Id.*, at 546.

[12] North Carolina. See Appendix, *post*, p. 230.

[13] Delaware and California. See Appendix, *post*, p. 226.

of exclusion.[14] Significantly, most of the exclusionary states which have had to consider the issue have held that evidence obtained by *federal* officers in a search and seizure unlawful under the Fourth Amendment must be suppressed in a prosecution in the *state* courts. *State* v. *Arregui,* 44 Idaho 43, 254 P. 788; *Walters* v. *Commonwealth,* 199 Ky. 182, 250 S. W. 839; *Little* v. *State,* 171 Miss. 818, 159 So. 103; *State* v. *Rebasti,* 306 Mo. 336, 267 S. W. 858; *State* v. *Hiteshew,* 42 Wyo. 147, 292 P. 2; see *Ramirez* v. *State,* 123 Tex. Cr. R. 254, 58 S. W. 2d 829. Compare *Rea* v. *United States,* 350 U. S. 214.

The experience in California has been most illuminating. In 1955 the Supreme Court of that State resolutely turned its back on many years of precedent and adopted the exclusionary rule. *People* v. *Cahan,* 44 Cal. 2d 434, 282 P. 2d 905. "We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers. . . . Experience has demonstrated, however, that neither administrative, criminal nor civil remedies are effective in suppressing lawless searches and seizures. The innocent suffer with the guilty, and we cannot close our eyes to the effect the rule we adopt will have on the rights of those not before the court." 44 Cal. 2d 434, at 445, 447, 282 P. 2d 905, at 911–912, 913.

The chief law enforcement officer of California was quoted as having made this practical evaluation of the *Cahan* decision less than two years later:

> "The over-all effects of the Cahan decision, particularly in view of the rules now worked out by the Supreme Court, have been excellent. A much

---

[14] Rhode Island. See Appendix, *post,* p. 231.

greater education is called for on the part of all peace officers of California. As a result, I am confident they will be much better police officers. I think there is more cooperation with the District Attorneys and this will make for better administration of criminal justice." [15]

Impressive as is this experience of individual states, even more is to be said for adoption of the exclusionary rule in the particular context here presented—a context which brings into focus considerations of federalism. The very essence of a healthy federalism depends upon the avoidance of needless conflict between state and federal courts. Yet when a federal court sitting in an exclusionary state admits evidence lawlessly seized by state agents, it not only frustrates state policy, but frustrates that policy in a particularly inappropriate and ironic way. For by admitting the unlawfully seized evidence the federal court serves to defeat the state's effort to assure obedience to the Federal Constitution. In states which have not adopted the exclusionary rule, on the other hand, it would work no conflict with local policy for a federal court to decline to receive evidence unlawfully seized by state officers. The question with which we deal today affects not at all the freedom of the states to develop and apply their own sanctions in their own way. Cf. *Wolf* v. *Colorado,* 338 U. S. 25.

Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged. Yet that kind of cooperation is hardly promoted by a rule that implicitly invites federal officers to withdraw from such association and at least tacitly to encour-

[15] Excerpt from letter of Governor Edmund G. Brown, then Attorney General of the State of California, to the Stanford Law Review, quoted in Note, 9 Stan. L. Rev. 515, 538 (1957). See also Barrett, Exclusion of Evidence Obtained by Illegal Searches—A Comment on People vs. Cahan, 43 Cal. L. Rev. 565, 586–588 (1955).

age state officers in the disregard of constitutionally protected freedom. If, on the other hand, it is understood that the fruit of an unlawful search by state agents will be inadmissible in a federal trial, there can be no inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation. Instead, forthright cooperation under constitutional standards will be promoted and fostered.

It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures. Without pausing to analyze individual decisions, it can fairly be said that in applying the Fourth Amendment this Court has seldom shown itself unaware of the practical demands of effective criminal investigation and law enforcement. Indeed, there are those who think that some of the Court's decisions have tipped the balance too heavily against the protection of that individual privacy which it was the purpose of the Fourth Amendment to guarantee. See *Harris* v. *United States,* 331 U. S. 145, 155, 183, 195 (dissenting opinions); *United States* v. *Rabinowitz,* 339 U. S. 56, 66, 68 (dissenting opinions). In any event, while individual cases have sometimes evoked "fluctuating differences of view," *Abel* v. *United States,* 362 U. S. 217, 235, it can hardly be said that in the over-all pattern of Fourth Amendment decisions this Court has been either unrealistic or visionary.

These, then, are the considerations of reason and experience which point to the rejection of a doctrine that would freely admit in a federal criminal trial evidence seized by state agents in violation of the defendant's constitutional rights. But there is another consideration— the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead* v. *United States,* 277 U. S. 438, at 469, 471, more than 30 years ago. "For those who

agree with me," said Mr. Justice Holmes, "no distinction can be taken between the Government as prosecutor and the Government as judge." 277 U. S., at 470. (Dissenting opinion.) "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." 277 U. S., at 485. (Dissenting opinion.)

This basic principle was accepted by the Court in *McNabb* v. *United States,* 318 U. S. 332. There it was held that "a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law." 318 U. S., at 345. Even less should the federal courts be accomplices in the willful disobedience of a Constitution they are sworn to uphold.

For these reasons we hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial.[16] In deter-

---

[16] See Rule 41 (e), Fed. Rules Crim. Proc. The defendant, of course, must have "standing" to object. See *Jones* v. *United States,* 362 U. S. 257.

mining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

The judgment of the Court of Appeals is set aside, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*Vacated and remanded.*

## APPENDIX TO OPINION OF THE COURT.

Table I.—*Admissibility, in state courts, of evidence illegally seized by state officers.*

| State | Pre-Weeks | Pre-Wolf | Post-Wolf |
|---|---|---|---|
| Alabama | Admissible | Admissible | Partially excludable |
| Arizona | | Admissible | Admissible |
| Arkansas | Admissible | Admissible | Admissible |
| California | Admissible | Admissible | Excludable |
| Colorado | | Admissible | Admissible |
| Connecticut | Admissible | Admissible | Admissible |
| Delaware | | Admissible | Excludable |
| Florida | | Excludable | Excludable |
| Georgia | Admissible | Admissible | Admissible |
| Idaho | Admissible | Excludable | Excludable |
| Illinois | Admissible | Excludable | Excludable |
| Indiana | | Excludable | Excludable |
| Iowa | Excludable | Admissible | Admissible |
| Kansas | Admissible | Admissible | Admissible |
| Kentucky | | Excludable | Excludable |
| Louisiana | | Admissible | Admissible |
| Maine | Admissible | Admissible | Admissible |
| Maryland | Admissible | Partially excludable | Partially excludable |
| Massachusetts | Admissible | Admissible | Admissible |

TABLE I.—*Admissibility, in state courts, of evidence illegally seized by state officers*—Continued.

| State | Pre-Weeks | Pre-Wolf | Post-Wolf |
|---|---|---|---|
| Michigan | Admissible | Excludable | Partially excludable |
| Minnesota | Admissible | Admissible | Admissible |
| Mississippi | | Excludable | Excludable |
| Missouri | Admissible | Excludable | Excludable |
| Montana | Admissible | Excludable | Excludable |
| Nebraska | Admissible | Admissible | Admissible |
| Nevada | | Admissible | Admissible |
| New Hampshire | Admissible | Admissible | Admissible |
| New Jersey | | Admissible | Admissible |
| New Mexico | | Admissible | Admissible |
| New York | Admissible | Admissible | Admissible |
| North Carolina | Admissible | Admissible | Excludable |
| North Dakota | | Admissible | Admissible |
| Ohio | | Admissible | Admissible |
| Oklahoma | Admissible | Excludable | Excludable |
| Oregon | Admissible | Excludable | Excludable |
| Pennsylvania | | Admissible | Admissible |
| Rhode Island | | | Excludable |
| South Carolina | Admissible | Admissible | Admissible |
| South Dakota | Admissible | Excludable | Partially excludable |
| Tennessee | Admissible | Excludable | Excludable |
| Texas | | Excludable | Excludable |
| Utah | | Admissible | Admissible |
| Vermont | Admissible | Admissible | Admissible |
| Virginia | | Admissible | Admissible |
| Washington | Admissible | Excludable | Excludable |
| West Virginia | Admissible | Excludable | Excludable |
| Wisconsin | | Excludable | Excludable |
| Wyoming | | Excludable | Excludable |
| | To admit—27 | To admit—29 | To admit—24 |
| | To exclude—1 | To exclude—18. | To exclude—26* |
| | Undecided—20. | Undecided—1. | Undecided—0. |

*Alaska and Hawaii both hold illegally obtained evidence to be excludable, although it does not appear that either has passed anew on this question since attaining statehood.

TABLE II.—*Representative cases by state, considering the admissibility of evidence illegally seized by state officers.*

ALABAMA

Pre-Weeks: *Shields* v. *State*, 104 Ala. 35, 16 So. 85 (admissible).

Pre-Wolf: *Banks* v. *State*, 207 Ala. 179, 93 So. 293 (admissible).

Post-Wolf: Cf. *Oldham* v. *State*, 259 Ala. 507, 67 So. 2d 55 (admissible).

(Ala. Code, 1940 (Supp. 1955), Tit. 29, § 210, requires the exclusion of illegally obtained evidence in the trial of certain alcohol control cases.)

ARIZONA

Pre-Weeks: no holding.

Pre-Wolf: *Argetakis* v. *State*, 24 Ariz. 599, 212 P. 372 (admissible).

Post-Wolf: *State* v. *Thomas*, 78 Ariz. 52, 275 P. 2d 408 (admissible).

ARKANSAS

Pre-Weeks: *Starchman* v. *State*, 62 Ark. 538, 36 S. W. 940 (admissible).

Pre-Wolf: *Benson* v. *State*, 149 Ark. 633, 233 S. W. 758 (admissible).

Post-Wolf: *Lane, Smith & Barg* v. *State*, 217 Ark. 114, 229 S. W. 2d 43 (admissible).

CALIFORNIA

Pre-Weeks: *People* v. *Le Doux*, 155 Cal. 535, 102 P. 517 (admissible).

Pre-Wolf: *People* v. *Mayen*, 188 Cal. 237, 205 P. 435 (admissible).

Post-Wolf: *People* v. *Cahan*, 44 Cal. 2d 434, 282 P. 2d 905 (excludable).

COLORADO

Pre-Weeks: no holding.

Pre-Wolf: *Massantonio* v. *People*, 77 Colo. 392, 236 P. 1019 (admissible).

Post-Wolf: *Williams* v. *People*, 136 Colo. 164, 315 P. 2d 189 (admissible).

CONNECTICUT

Pre-Weeks: *State* v. *Griswold*, 67 Conn. 290, 34 A. 1046 (admissible).

Pre-Wolf: *State* v. *Reynolds*, 101 Conn. 224, 125 A. 636 (admissible).

Post-Wolf: no holding.

DELAWARE

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *Chuchola*, 32 Del. 133, 120 A. 212 (admissible).

Post-Wolf: *Rickards* v. *State*, 45 Del. 573, 77 A. 2d 199 (excludable).

FLORIDA
 Pre-Weeks: no holding.
 Pre-Wolf: *Atz* v. *Andrews*, 84 Fla. 43, 94 So. 329 (excludable).
 Post-Wolf: *Byrd* v. *State*, 80 So. 2d 694 (Sup. Ct. Florida) (excludable).

GEORGIA
 Pre-Weeks: *Williams* v. *State*, 100 Ga. 511, 28 S. E. 624 (admissible).
 Pre-Wolf: *Jackson* v. *State*, 156 Ga. 647, 119 S. E. 525 (admissible).
 Post-Wolf: *Atterberry* v. *State*, 212 Ga. 778, 95 S. E. 2d 787 (admissible).

IDAHO
 Pre-Weeks: *State* v. *Bond*, 12 Idaho 424, 86 P. 43 (admissible).
 Pre-Wolf: *State* v. *Arregui*, 44 Idaho 43, 254 P. 788 (excludable.)
 Post-Wolf: no holding.

ILLINOIS
 Pre-Weeks: *Siebert* v. *People*, 143 Ill. 571, 32 N. E. 431 (admissible).
 Pre-Wolf: *People* v. *Castree*, 311 Ill. 392, 143 N. E. 112 (excludable).
 Post-Wolf: *City of Chicago* v. *Lord*, 7 Ill. 2d 379, 130 N. E. 2d 504 (excludable).

INDIANA
 Pre-Weeks: no holding.
 Pre-Wolf: *Flum* v. *State*, 193 Ind. 585, 141 N. E. 353 (excludable).
 Post-Wolf: *Rohlfing* v. *State*, 230 Ind. 236, 102 N. E. 2d 199 (excludable).

IOWA
 Pre-Weeks: *State* v. *Sheridan*, 121 Iowa 164, 96 N. W. 730 (excludable).
 Pre-Wolf: *State* v. *Rowley*, 197 Iowa 977, 195 N. W. 881 (admissible).
 Post-Wolf: *State* v. *Smith*, 247 Iowa 500, 73 N. W. 2d 189 (admissible).

KANSAS
 Pre-Weeks: *State* v. *Miller*, 63 Kan. 62, 64 P. 1033 (admissible).
 Pre-Wolf: *State* v. *Johnson*, 116 Kan. 58, 226 P. 245 (admissible).
 Post-Wolf: *State* v. *Peasley*, 179 Kan. 314, 295 P. 2d 627 (admissible).

KENTUCKY
 Pre-Weeks: no holding.
 Pre-Wolf: *Youman* v. *Commonwealth*, 189 Ky. 152, 224 S. W. 860 (excludable).

228

Post-Wolf: *Johnson* v. *Commonwealth,* 296 S. W. 2d 210 (Ct. App. Kentucky) (excludable).

LOUISIANA
Pre-Weeks: no holding.
Pre-Wolf: *State* v. *Fleckinger,* 152 La. 337, 93 So. 115 (admissible).
Post-Wolf: *State* v. *Mastricovo,* 221 La. 312, 59 So. 2d 403 (admissible).

MAINE
Pre-Weeks: *State* v. *Gorham,* 65 Me. 270 (admissible) *(semble).*
Pre-Wolf: *State* v. *Schoppe,* 113 Me. 10, 92 A. 867 (admissible) *(semble).*
Post-Wolf: no holding.

MARYLAND
Pre-Weeks: *Lawrence* v. *State,* 103 Md. 17, 63 A. 96 (admissible).
Pre-Wolf: *Meisinger* v. *State,* 155 Md. 195, 141 A. 536 (admissible).
Post-Wolf: *Stevens* v. *State,* 202 Md. 117, 95 A. 2d 877 (admissible). (Flack's Md. Ann. Code, 1951, Art. 35, § 5 requires the exclusion of illegally obtained evidence in the trial of most misdemeanors.)

MASSACHUSETTS
Pre-Weeks: *Commonwealth* v. *Dana,* 43 Mass. 329 (admissible).
Pre-Wolf: *Commonwealth* v. *Wilkins,* 243 Mass. 356, 138 N. E. 11 (admissible).
Post-Wolf: no holding.

MICHIGAN
Pre-Weeks: *People* v. *Aldorfer,* 164 Mich. 676, 130 N. W. 351 (admissible).
Pre-Wolf: *People* v. *Marxhausen,* 204 Mich. 559, 171 N. W. 557 (excludable).
Post-Wolf: *People* v. *Hildabridle,* 353 Mich. 562, 92 N. W. 2d 6 (excludable). (Art. II, § 10 of the Michigan Constitution of 1908, as amended, sets forth a limited class of items which are not excludable. See *People* v. *Gonzales,* 356 Mich. 247, 97 N. W. 2d 16.)

MINNESOTA
Pre-Weeks: *State* v. *Strait,* 94 Minn. 384, 102 N. W. 913 (admissible).
Pre-Wolf: *State* v. *Pluth,* 157 Minn. 145, 195 N. W. 789 (admissible).
Post-Wolf: no holding.

MISSISSIPPI
> Pre-Weeks: no holding.
> Pre-Wolf: *Tucker* v. *State*, 128 Miss. 211, 90 So. 845 (excludable).
> Post-Wolf: *Nobles* v. *State*, 222 Miss. 827, 77 So. 2d 288 (excludable).

MISSOURI
> Pre-Weeks: *State* v. *Pomeroy*, 130 Mo. 489, 32 S. W. 1002 (admissible).
> Pre-Wolf: *State* v. *Owens*, 302 Mo. 348, 259 S. W. 100 (excludable).
> Post-Wolf: *State* v. *Hunt*, 280 S. W. 2d 37 (Sup. Ct. Missouri) (excludable).

MONTANA
> Pre-Weeks: *State* v. *Fuller*, 34 Mont. 12, 85 P. 369 (admissible).
> Pre-Wolf: *State ex rel. King* v. *District Court*, 70 Mont. 191, 224 P. 862 (excludable).
> Post-Wolf: no holding.

NEBRASKA
> Pre-Weeks: *Geiger* v. *State*, 6 Neb. 545 (admissible).
> Pre-Wolf: *Billings* v. *State*, 109 Neb. 596, 191 N. W. 721 (admissible).
> Post-Wolf: *Haswell* v. *State*, 167 Neb. 169, 92 N. W. 2d 161 (admissible).

NEVADA
> Pre-Weeks: no holding.
> Pre-Wolf: *State* v. *Chin Gim*, 47 Nev. 431, 224 P. 798 (admissible).
> Post-Wolf: no holding.

NEW HAMPSHIRE
> Pre-Weeks: *State* v. *Flynn*, 36 N. H. 64 (admissible).
> Pre-Wolf: *State* v. *Agalos*, 79 N. H. 241, 107 A. 314 (admissible).
> Post-Wolf: *State* v. *Mara*, 96 N. H. 463, 78 A. 2d 922 (admissible).

NEW JERSEY
> Pre-Weeks: no holding
> Pre-Wolf: *State* v. *Black*, 5 N. J. Misc. 48, 135 A. 685 (admissible).
> Post-Wolf: *Eleuteri* v. *Richman*, 26 N. J. 506, 141 A. 2d 46 (admissible).
> > (N. J. Rev. Stat. 33:1–62 provides for the return of items illegally seized in the investigation of certain alcohol control offenses.)

NEW MEXICO

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *Dillon*, 34 N. M. 366, 281 P. 474 (admissible).

Post-Wolf: *Breithaupt* v. *Abram*, 58 N. M. 385, 271 P. 2d 827 (admissible).

NEW YORK

Pre-Weeks: *People* v. *Adams*, 176 N. Y. 351, 68 N. E. 636 (admissible).

Pre-Wolf: *People* v. *Defore*, 242 N. Y. 13, 150 N. E. 585 (admissible).

Post-Wolf: *People* v. *Variano*, 5 N. Y. 2d 391, 157 N. E. 2d 857 (admissible).

NORTH CAROLINA

Pre-Weeks: *State* v. *Wallace*, 162 N. C. 622, 78 S. E. 1 (admissible).

Pre-Wolf: *State* v. *Simmons*, 183 N. C. 684, 110 S. E. 591 (admissible).

Post-Wolf: *State* v. *Mills*, 246 N. C. 237, 98 S. E. 2d 329 (excludable).
(N. C. Gen. Stat. § 15–27 requires the exclusion of illegally obtained evidence.)

NORTH DAKOTA

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *Fahn*, 53 N. D. 203, 205 N. W. 67 (admissible).

Post-Wolf: no holding.

OHIO

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *Lindway*, 131 Ohio St. 166, 2 N. E. 2d 490 (admissible).

Post-Wolf: *State* v. *Mapp*, 170 Ohio St. 427, 166 N. E. 2d 387 (admissible).

OKLAHOMA

Pre-Weeks: *Silva* v. *State*, 6 Okla. Cr. 97, 116 P. 199 (admissible).

Pre-Wolf: *Gore* v. *State*, 24 Okla. Cr. 394, 218 P. 545 (excludable).

Post-Wolf: *Hamel* v. *State*, 317 P. 2d 285 (Okla. Crim.) (excludable).

OREGON

Pre-Weeks: *State* v. *McDaniel*, 39 Ore. 161, 65 P. 520 (admissible).

Pre-Wolf: See *State* v. *Laundy*, 103 Ore. 443, 204 P. 958 (excludable), although see *State* v. *Folkes*, 174 Ore. 568, 150 P. 2d 17 (not noticing *State* v. *Laundy*).

Post-Wolf: *State* v. *Hoover*, 219 Ore. 288, 347 P. 2d 69 (questioning *Laundy*).

PENNSYLVANIA
 Pre-Weeks: no holding.
 Pre-Wolf: *Commonwealth* v. *Dabbierio*, 290 Pa. 174, 138 A. 679
 (admissible).
 Post-Wolf: *Commonwealth* v. *Chaitt*, 380 Pa. 532, 112 A. 2d 379
 (admissible).

RHODE ISLAND
 Pre-Weeks: no holding.
 Pre-Wolf: no holding.
 Post-Wolf: *State* v. *Hillman*, 84 R. I. 396, 125 A. 2d 94 (applying
 common law rule, but noticing the enactment of
 the statutory rule).
 (R. I. Gen. Laws, 1956, § 9–19–25 requires the
 exclusion of illegally obtained evidence.)

SOUTH CAROLINA
 Pre-Weeks: *State* v. *Atkinson*, 40 S. C. 363, 18 S. E. 1021 (ad-
 missible).
 Pre-Wolf: *State* v. *Green*, 121 S. C. 230, 114 S. E. 317 (admis-
 sible).
 Post-Wolf: *State* v. *Anderson*, 230 S. C. 191, 95 S. E. 2d 164
 (admissible).

SOUTH DAKOTA
 Pre-Weeks: *State* v. *Madison*, 23 S. D. 584, 122 N. W. 647 (ad-
 missible).
 Pre-Wolf: *State* v. *Gooder*, 57 S. D. 619, 234 N. W. 610 (exclud-
 able).
 Post-Wolf: *State* v. *Poppenga*, 76 S. D. 592, 83 N. W. 2d 518
 (excludable).
 S. D. Code, 1939, § 34.1102 provides for a limited
 return to the common-law rule of admissibility.
 See *State* v. *Lane*, 76 S. D. 544, 82 N. W. 2d. 286.

TENNESSEE
 Pre-Weeks: *Cohn* v. *State*, 120 Tenn. 61, 109 S. W. 1149 (ad-
 missible).
 Pre-Wolf: *Hughes* v. *State*, 145 Tenn. 544, 238 S. W. 588 (ex-
 cludable).
 Post-Wolf: *Lindsey* v. *State*, 191 Tenn. 51, 231 S. W. 2d 380
 (excludable).

TEXAS
 Pre-Weeks: no holding.
 Pre-Wolf: *Chapin* v. *State*, 107 Tex. Cr. R. 477, 296 S. W. 1095
 (excludable).

Post-Wolf: *Williamson* v. *State*, 156 Tex. Cr. R. 520, 244 S. W. 2d 202 (excludable).

(Vernon's Tex. Stat., 1948 (Code Crim. Proc., Art. 72a) requires the exclusion of illegally obtained evidence.)

UTAH

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *Aime*, 62 Utah 476, 220 P. 704 (admissible).

Post-Wolf: no holding.

VERMONT

Pre-Weeks: *State* v. *Mathers*, 64 Vt. 101, 23 A. 590 (admissible).

Pre-Wolf: *State* v. *Stacy*, 104 Vt. 379, 160 A. 257 (admissible).

Post-Wolf: *In re Raymo*, 121 Vt. 246, 154 A. 2d 487 (admissible).

VIRGINIA

Pre-Weeks: no holding.

Pre-Wolf: *Hall* v. *Commonwealth*, 138 Va. 727, 121 S. E. 154 (admissible).

Post-Wolf: no holding.

WASHINGTON

Pre-Weeks: *State* v. *Royce*, 38 Wash. 111, 80 P. 268 (admissible).

Pre-Wolf: *State* v. *Gibbons*, 118 Wash. 171, 203 P. 390 (excludable).

Post-Wolf: *State* v. *Cyr*, 40 Wash. 2d 840, 246 P. 2d 480 (excludable).

WEST VIRGINIA

Pre-Weeks: *State* v. *Edwards*, 51 W. Va. 220, 41 S. E. 429 (admissible).

Pre-Wolf: *State* v. *Wills*, 91 W. Va. 659, 114 S. E. 261 (excludable).

Post-Wolf: *State* v. *Calandros*, 140 W. Va. 720, 86 S. E. 2d 242 (excludable).

WISCONSIN

Pre-Weeks: no holding.

Pre-Wolf: *Hoyer* v. *State*, 180 Wis. 407, 193 N. W. 89 (excludable).

Post-Wolf: *State* v. *Kroening*, 274 Wis. 266, 79 N. W. 2d 810 (excludable).

WYOMING

Pre-Weeks: no holding.

Pre-Wolf: *State* v. *George*, 32 Wyo. 223, 231 P. 683 (excludable).

Post-Wolf: no holding.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER join, dissenting.*

The Court today overturns a rule of evidence always the law and formally announced in 1914 by a unanimous Court including Mr. Justice Holmes and Mr. Justice Hughes. *Weeks* v. *United States,* 232 U. S. 383, 398. The rule has since that time been applied in this Court's unanimous *per curiam* decision in 1925 in *Center* v. *United States,* 267 U. S. 575, and for nearly half a century, as a matter of course, in federal prosecutions without number throughout the United States. In 1927, a unanimous Court, on which sat Mr. Justice Holmes, Mr. Justice Brandeis and Mr. Justice Stone, thus acknowledged the rule: "[w]e do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account." *Byars* v. *United States,* 273 U. S. 28, 33. It can hardly be denied that Mr. Justice Holmes and Mr. Justice Brandeis were the originators and formulators of the body of our present constitutional law pertaining to civil liberties; pronouncements since have merely been echoes and applications, when not distortions, of principles laid down by them.

Of course our law, and particularly our procedural law, does not stick fast in the past. (Speaking wholly for myself, there is indeed an appropriate basis derived from the nature of our federalism—which I shall later set forth—for modification in the circumstances of the present cases of the rule admitting state-seized evidence, regardless of the way in which it was seized.) But when a rule of law has the history and the intrinsic authority of the rule overturned today, when it has been for so long a part

---

*[This opinion applies also to No. 52, *Rios* v. *United States, post,* p. 253.]

of the administration of justice in the federal courts, a change, when not constitutionally compelled as the present change concededly is not, must justify itself either by the demands of new experience undermining the justification of the established rule or by new insight into the undesirable consequences of the old rule. The rule the Court newly promulgates today draws upon neither of these justifications and is not supported by any of this Court's previous decisions, while raising serious difficulties in its application, including undue conflict with state law and with state courts.

We are concerned with a rule governing the admissibility of relevant evidence in federal courts. The pertinent general principle, responding to the deepest needs of society, is that society is entitled to every man's evidence. As the underlying aim of judicial inquiry is ascertainable truth, everything rationally related to ascertaining the truth is presumptively admissible. Limitations are properly placed upon the operation of this general principle only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth. The basic consideration in these cases is whether there are present any overriding reasons for not accepting evidence concededly relevant to a federal judicial inquiry regarding a violation of federal law.

Overriding public considerations are reflected in the exclusion from evidence of the narrow classes of privileged communications, in the exclusion designed to prevent people from being compelled to convict themselves out of their own mouths developed under the shelter of the Fifth Amendment's privilege against self-incrimination, and insofar as the Due Process Clause of the Fourteenth Amendment puts curbs on the evidentiary law of the States. Respect is also due a further consideration

that courts of law are, after all, in the service of justice and that the enforcement of basic moralities by courts should at times be deemed more important than the full utilization of all relevant evidence in a particular case. See *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. Regard for this consideration led Mr. Justice Holmes and Mr. Justice Brandeis to urge that the federal courts should not permit the Department of Justice to become the willing beneficiary of stolen goods through their use in evidence in a federal prosecution: "Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play." It is noteworthy that while this view was expressed by Holmes and Brandeis, JJ. in 1921 in dissent in *Burdeau* v. *McDowell,* 256 U. S. 465, 477, it did not lead them in 1927, in *Byars* v. *United States, supra,* to question the right of the Federal Government to utilize the very kind of evidence involved in these two cases.

Closer to our immediate problem are the evidentiary problems arising out of the interdiction of the Fourth Amendment against "unreasonable searches and seizures." This constitutional provision addresses itself to matters that vitally relate to individual freedom. On this account another exclusion of relevant evidence has been developed in the federal courts in response to what was deemed to be a compelling public need implicit in that Amendment. Because of what was deemed to be a vital relation to the vindication of the Amendment so that its important protection would otherwise be of "no value," this Court in *Weeks* v. *United States,* 232 U. S. 383, held it appropriate to exclude from federal courts evidence seized by federal officials in disregard of the Fourth Amendment. It was thought more important to exert general legal pressures to secure obedience to the Fourth Amendment on the part of federal law-enforcing officers than to enforce the general principle of relevance in particular cases. This

236

exclusionary rule of *Weeks* has also been applied to violations of federal law by federal officers, closely relating to the interests protected by the Fourth Amendment, although not of the full seriousness of constitutional violations. See, *e. g., Miller* v. *United States,* 357 U. S. 301.

The Fourth Amendment, as applied in *Weeks* and cases since, operates, as do all the provisions of the Federal Bill of Rights, within the limitations imposed by our federal system. It has been held without deviation that the specific provisions of the first eight Amendments are not limitations upon the power of the States or available safeguards of the individual against state authority. Of course the same is true of procedural protections afforded by federal statutes not resting on the Constitution. It has followed from this that, until today, in applying the *Weeks* rule of exclusion a vital question has always been whether the offending search or seizure was conducted in any part by federal officials or in the interest of the Federal Government, or whether it was conducted solely by state officers acting exclusively for state purposes. Only if the Federal Government "had a hand" in the search could the Fourth Amendment or federal statutory restrictions, and thus the *Weeks* exclusionary rule, apply. See *Byars* v. *United States,* 273 U. S. 28; *Lustig* v. *United States,* 338 U. S. 74, 78. The *Weeks* case itself, as has been said, held that state misconduct was not to be the basis for application of the federal exclusionary rule. 232 U. S., at 398. Until today that has been the law of the land.

Have there been developments since *Weeks,* either intellectual or practical, which should lead the Court to overturn the authoritative rule of that case and for the first time bar relevant evidence innocently secured by federal authorities, in cases involving no federal misconduct whatever, where there has been neither violation of

the Fourth Amendment nor violation of a federal statute by federal officers or any agent for them?

The Court finds such a significant development, destroying in its view the "foundations," the "doctrinal underpinning" of the express and authoritative limitation of the *Weeks* exclusionary rule to cases of federal violations, in what was said in 1949 in *Wolf* v. *Colorado,* 338 U. S. 25, 27–28, recognizing that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." The Court asserts that there is no longer any logic in restricting the application of the *Weeks* exclusionary rule to the fruits of federal seizures, for *Wolf* recognizes that state seizures may also encroach on interests protected by the Federal Constitution. The rule which the Court announces on the basis of this analysis is that there is to be excluded from federal prosecutions all evidence seized by state officers "during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment." As the Court's rule only purports to exclude evidence seized by state officers in violation of the Constitution, it is plain that the Court assumes for the purposes of these cases that, as a consequence of *Wolf,* precisely the same rules are applicable in determining whether the conduct of state officials violates the Constitution as are applicable in determining whether the conduct of federal officials does so, and precisely the same exclusionary remedy is deemed appropriate for one behavior as for the other.

In this use of *Wolf* the Court disregards not only what precisely was said there, namely, that only what was

characterized as the "core of the Fourth Amendment," not the Amendment itself, is enforceable against the States, but also the fact that what was said in *Wolf* was said with reference to the Due Process Clause of the Fourteenth Amendment, and not with reference to the specific guarantees of the Fourth Amendment. The scope and effect of these two constitutional provisions cannot be equated, as the Court would have it. These are constitutional provisions wholly different in history, scope and incidence, and that is crucial to our problem. It is of course true, as expressed in *Wolf*, that some of the principles underlying the specific safeguards of the first eight Amendments are implied limitations upon the States drawn out of the Due Process Clause of the Fourteenth Amendment, and to that extent, but no more, afford federal protection to individuals against state power. But it is basic to the structure and functioning of our federal system to distinguish between the specifics of the Bill of Rights of the first eight Amendments and the generalities of the Due Process Clause translated into concreteness case by case ever since *Davidson* v. *New Orleans,* 96 U. S. 97, by a process of inclusion and exclusion, as analyzed with great particularity by Mr. Justice Cardozo in *Palko* v. *Connecticut,* 302 U. S. 319.

This vital distinction, running through hundreds of cases, underlies the decision in *Wolf* v. *Colorado.* It is therefore a complete misconception of the *Wolf* case to assume, as the Court does as the basis for its innovating rule, that every finding by this Court of a technical lack of a search warrant, thereby making a search unreasonable under the Fourth Amendment, constitutes an "arbitrary intrusion" of privacy so as to make the same conduct on the part of state officials a violation of the Fourteenth Amendment. The divisions in this Court over the years regarding what is and what is not to be deemed an unreasonable search within the meaning of the Fourth Amend-

ment and the shifting views of members of the Court in this regard, prove that in evolving the meaning of the Fourth Amendment the decisions of this Court have frequently turned on dialectical niceties and have not reflected those fundamental considerations of civilized conduct on which applications of the Due Process Clause turn. See, for example, the varying views of the Court as a whole, and of individual members, regarding the "reasonableness" under the Fourth Amendment of searches without warrants incident to arrests, as illustrated by comparing *Marron* v. *United States,* 275 U. S. 192, with *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452; *Go-Bart, supra,* and *Lefkowitz, supra,* with *Harris* v. *United States,* 331 U. S. 145, and *United States* v. *Rabinowitz,* 339 U. S. 56; also *Harris, supra,* with *Trupiano* v. *United States,* 334 U. S. 699, and *Trupiano* with *Rabinowitz, supra* (overruling *Trupiano*). See also the Court's differing conceptions regarding the evidence necessary to constitute "probable cause" upon which to base a warrant or a search without a warrant, as revealed by comparing *Grau* v. *United States,* 287 U. S. 124, 128, with *Draper* v. *United States,* 358 U. S. 307, 312, n. 4 (rejecting *Grau*), and *Jones* v. *United States,* 362 U. S. 257, 270.

What the Court now decides is that these variegated judgments, these fluctuating and uncertain views of what constitutes an "unreasonable search" under the Fourth Amendment in conduct by federal officials, are to determine whether what is done by state police, wholly beyond federal supervision, violates the Due Process Clause. The observation in *Wolf* v. *Colorado,* reflecting as it did the fundamental protection of the Due Process Clause against "arbitrary" police conduct, and not the specific, restrictive protection of the Fourth Amendment, hardly supports that proposition or the new rule which the Court rests upon it. The identity of the protection

of the Due Process Clause against arbitrary searches with the scope of the protection of the Fourth Amendment is something the Court assumes for the first time today. It assumes this without explication in reason or in reliance upon authority, and entirely without regard for the essential difference, which has always been recognized by this Court, between the particularities of the first eight Amendments and the fundamental nature of what constitutes due process.

Nor can I understand how *Wolf* v. *Colorado* furnishes the slightest support for the application of the *Weeks* exclusionary rule, designed as that was to enforce the Fourth Amendment and indirectly to discipline federal officers under this Court's peculiarly comprehensive supervisory power over them, to the present cases, where the infractions, if any, were by state officers and were of rights arising under the Due Process Clause of the Fourteenth Amendment. The Court finds what it calls the "ultimate holding" in *Wolf,* namely, that the exclusionary rule is not to be fastened upon state courts in enforcement of rights arising under the protection of the Fourteenth Amendment against arbitrary searches and seizures, something with which "we are not here directly concerned." I fail to understand why this holding is not of essential relevance to the holding of these cases. In the first place *Wolf* wholly rebuts the Court's assertion that there is no logic in distinguishing how the Fourteenth Amendment is to be enforced against state officials from how the Fourth is to be enforced against federal officers. The point of *Wolf* was that the logic of this was imperative and that the remedies under the two Amendments are not the same. In the second place, in light of the holding of *Wolf* that state courts may admit evidence like that involved in these cases, it cannot be said that there is any sufficient justification based upon controlling the conduct of state officers for excluding such evidence from federal

courts, as the Court would do, when gathered by state officials whose States would admit it. The underlying assumption on which the exclusionary rule of *Weeks* rests is that barring evidence illegally secured will have an inhibiting, one hopes a civilizing, influence upon law officers. With due respect, it is fanciful to assume that law-enforcing authorities of States which do not have an exclusionary rule will to any significant degree be influenced by the potential exclusion in federal prosecutions of evidence secured by them when state prosecutions, which surely are their preoccupation, remain free to use the evidence. At any rate, what warrant is there for the federal courts to assume the same supervisory control over state officials as they have assumed over federal officers, even if that control could be effective? And the exertion of controlling pressures upon the police is admittedly the only justification for any exclusionary rule.

Thus, I do not understand how *Wolf* v. *Colorado,* which is the only case relied upon by the Court as authority for its innovation, furnishes support for the Court's new rule of evidence. It seems to me to do the opposite. Nor can the Court's new rule be justified as an effective means for controlling state officers. Neither do I think the Court's adoption of an exclusionary rule in the present cases finds justification, as the Court suggests, in light of any universal recognition of the need of excluding evidence such as is involved in these cases in order to assure the wise and effective administration of criminal justice. It cannot be denied that the appropriateness of barring relevant evidence as a means for regulating police conduct has not been unquestioned even by those most zealous for honest law enforcement, and it certainly has not gone unquestioned as outweighing the interest of society in bringing criminals to justice. See, *e. g., People* v. *Defore,* 242 N. Y. 13, 21, 150 N. E. 585, 587–588; 8 Wigmore, Evidence (3d ed. 1940), § 2184. And I regret to say that I do not

find evidence that the movement towards adoption of the rule of exclusion has been, as we are told, "seemingly inexorable." On the contrary, what impresses me is the obduracy of high-minded state courts, like that of New York under the leadership of Judge Cardozo, in refusing to adopt the federal rule of exclusion. Indeed, this impressive insistence of States not to follow the *Weeks* exclusionary rule was the controlling consideration of the decision in *Wolf* not to read it into the requirement of "due process" under the Fourteenth Amendment. As the material the Court has collected shows, fully half the States have refused to adhere to our *Weeks* rule, nearly fifty years after this Court has deemed it appropriate for the federal administration of criminal justice.

Apart from any affirmative justifications for the new rule, it is suggested in support of the need for making the Court's innovation that the distinction made since *Weeks* v. *United States* for purposes of excluding evidence, turning on whether or not federal officials had any share in the search, has engendered practical difficulties and for that reason ought now to be discarded. It is also suggested that the rule which has prevailed under *Weeks* and *Byars* to this day "implicitly invites federal officers to withdraw from such association [with state law-enforcement officers] and at least tacitly to encourage state officers in the disregard of constitutionally protected freedom." I am not aware of evidence to sustain the view that the distinction between federal and state searches has been particularly difficult of application. Individual cases have merely presented the everyday issue of evaluating testimony and testimony touching an issue relatively easy of ascertainment. I know of no opinion in any federal court, and the Court points to none, which has revealed any consciousness of having been confronted with too exacting a task for adjudication when called upon to decide whether a search was or was not to be deemed a federal search.

This Court's decisions certainly do not reflect an awareness of such difficulties. And if the rule, as appears from the decisions of the judges who have had to apply it, has evidently been in general a workable one, it surely should not be discarded because of unsupported assumptions that federal officials are prone to evade it and to cooperate secretly with state police in improper activities. Disregard of the history, authority and experience that support the rule now cast into limbo ought to have a more substantiated justification than the fragile assumption that federal officers look for opportunities to engage in, to use the Court's language, "subterfuge" and "evasion" of a command sanctioned by this Court. I would not so belittle this Court's authority. I had supposed we should attribute to the law-enforcing authorities of the Government respect for this Court's weighty course of decisions and not a flouting of them.

Whatever difficulties of application there may be in the present rule—and the opinions of those who have had to apply it do not indicate that they are significant—they surely cannot lead us to exchange a tried and settled principle for the Court's new doctrine. For that doctrine, although the Court purports to be guided by the practical consequences of rules of evidence in this area and by considerations of comity between federal and state courts and policies, not only raises new and far greater difficulties than did the old rule, but is also pregnant with new disharmonies between federal and state authorities and between federal and state courts.

*First.* The Court's new rule introduces into the law governing the admissibility of search-and-seizure evidence in federal prosecutions a troublesome and uncertain new criterion, namely, the "unconstitutionality" of police conduct, as distinguished from its mere illegality under state or federal law. Under the rule the Court today announces, the federal trial court, whenever state-seized evidence is

challenged, must decide the wholly hypothetical question whether that evidence was "obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment." Irrelevant are violations of state law, or hypothetical violations of federal statutes, had the search been "conducted by federal officers."

The *Weeks* rule of exclusion, as enforced by this Court, applies to all illegal seizures on the part of federal officers. If the officer's conduct is by statute or court-developed rule illegal, the evidence is excluded, and it is not necessary to say whether or not the rule of conduct flows directly from the Constitution. This has been an efficient, workable evidentiary criterion unencumbered with weighty constitutional distinctions. See, for example, *Miller* v. *United States*, 357 U. S. 301, where evidence was excluded without a mention of the Constitution. This Court or the lower federal courts have thus never, until today, needed to develop criteria distinguishing those federal regulations of the conduct of federal officers which are compelled by the Constitution from those which are entrusted to the discretion of Congress or the courts to develop. We must do so now, and so must federal trial courts concern themselves with such constitutional determinations in the midst of adjudicating motions to suppress state evidence. This is bound to be a troublesome process in light of the complete absence of such criteria. For example, are the special federal provisions regarding night search warrants of a constitutional nature? And what of the rules governing the execution of lawful warrants, applied in *Miller* v. *United States, supra?* We have never needed to pronounce upon these totally abstract and doctrinaire questions, and there surely is no need to announce a rule which forces us to do so now, when such a rule is not constitutionally required, but is concededly imposed as

a matter of this Court's discretionary power to formulate rules of evidence for federal litigation. After all, it makes not the slightest difference from the point of view of the admissibility of evidence whether what a federal officer does is simply illegal or illegal because unconstitutional. Why introduce such subtleties, in a hypothetical federal context, when passing on state evidence?

*Second.* The Court's new rule potentially frustrates and creates undesirable conflict with valid and praiseworthy state policies which attempt to protect individuals from unlawful police conduct. Although the Court purports to be responsive to the needs of proper law enforcement and to considerations of comity between state and federal law, when it comes to elaborate its new rule it does so as follows: "[t]he test is one of federal [constitutional] law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." So comity plays no part at all, and the fruits of illegal law enforcement may well be admitted in federal courts directly contrary to state law. State law seeking to control improper methods of law enforcement is frustrated by the Court's new rule whenever a State which enforces an exclusionary rule places restrictions upon the conduct of its officers not directly required by the Fourth Amendment with regard to federal officers. The Court's new rule will, for example, admit evidence illegally seized under a state law which is identical to a federal statute restricting federal officers, so long as the federal statute goes beyond the minimum requirements of the Constitution. One would suppose that such a situation would be one in which this Court would plainly respect the state policy as constituting nothing but a local duplication of a federal policy. Yet the rule promulgated today flouts such a state regulation. A state officer who disobeys it needs only to turn his evidence over to the federal prosecutor, who may freely utilize it under today's

innovation in disregard of the disciplinary policy of the State's exclusionary rule. I cannot think why the federal courts should thus encourage state illegalities.

I do not merely indulge in assumptions regarding the serious frustrations of valid state regulations of state law-enforcement officers which may arise from the rule formulated today. Take a concrete example of this mischief. In *Breithaupt* v. *Abram,* 352 U. S. 432, this Court decided that it did not violate the Fourteenth Amendment for a State to take blood from a defendant without his consent and use it in evidence against him, for such police methods were found not to be "offensive" or "unreasonable." Nevertheless, States may decide, and have decided, that taking blood without consent is by state standards reprehensible, and that to discourage such conduct by its police blood-test evidence must be suppressed in use in state prosecutions. See *Lebel* v. *Swincicki,* 354 Mich. 427, 93 N. W. 2d 281; *State* v. *Kroening,* 274 Wis. 266, 271–276, 79 N. W. 2d 810, 814–817. Such a state policy is surely entitled to our respect if we are to exclude evidence on the basis of the illegal activity of state officers. Yet because of the decision in *Breithaupt,* the Court's new rule permits the admission of blood-test evidence in a federal prosecution, ignoring the State's decision that the police conduct producing it is illegal and that it therefore ought to be suppressed. And the same is to be true of evidence seized by state police in violation of a state rule regarding searches incident to lawful arrests which is more restrictive upon the police than the present version of the fluctuating federal rule, or of evidence seized pursuant to a warrant or to an arrest without a warrant which did not meet state standards of "probable cause" more restrictive than the federal standards as lately developed. State rules in these areas may be and in some States are more

restrictive than federal rules. See, for example, restricting the right of incidental search more than has this Court, *State* v. *Adams,* 103 W. Va. 77, 136 S. E. 703; *State* v. *Buckley,* 145 Wash. 87, 258 P. 1030; *Flannery* v. *Commonwealth,* 324 S. W. 2d 128 (Ky.); *Doyle* v. *State,* 320 P. 2d 412 (Okla.); and imposing more exacting standards of "probable cause" than federal law imposes, *Doyle* v. *State,* 320 P. 2d 412 (Okla.) (expressly refusing to follow *Brinegar* v. *United States,* 338 U. S. 160); *Averill* v. *State,* 52 So. 2d 791 (Fla.); *People* v. *Thymiakas,* 140 Cal. App. 2d 940, 296 P. 2d 4. Especially pertinent in this regard is the following statement in *People* v. *Cahan,* 44 Cal. 2d 434, 450–451, 282 P. 2d 905, 915, adopting an exclusionary rule for California: "In developing a rule of evidence applicable in the state courts, this court is not bound by the decisions that have applied the federal rule, and if it appears that those decisions have developed needless refinements and distinctions, this court need not follow them. Similarly, if the federal cases indicate needless limitations on the right to conduct reasonable searches and seizures or to secure warrants, this court is free to reject them."

In fact, in the very two cases now before the Court state courts have found their officers' conduct illegal and have ordered suppression of the evidence thereby gained. Yet the Court refuses to respect these findings and sends the cases back to the District Courts for independent rulings regarding the federal constitutional validity of the state officers' conduct. If these state infractions are not found to be of constitutional dimensions, and it is surely doubtful whether they were of that degree of seriousness under some of our decisions, the evidence will be admitted though wrongfully seized under the governing state law. The rule promulgated today would thus undo a State's disciplinary policy against police misconduct,

while in the contrary situation, where the State would admit evidence now rejected by the Court, police conduct sustained by state law would not be affected.

*Third.* The Court's new rule creates potential conflict between federal and state courts even when the legal standards of police conduct upon which exclusion is to turn are the same in both courts. The Court says that "[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out." Again considerations of comity are ignored. Applying the same legal standards, a federal tribunal may hold state officers blameless after a state court has condemned their conduct, or it may hold them to have been at fault after the State has absolved them. I cannot imagine the justification for permitting a federal court to make such conflicting pronouncements, debilitating local authority in matters over which the local courts should and do have primary responsibility.

In summary, then, although the Court professes to be responsive to "[t]he very essence of a healthy federalism" and "the avoidance of needless conflict between state and federal courts," the rule it actually formulates is wholly unresponsive to valid state policies while carrying a great risk of needless conflict between state and federal policies and between state and federal courts. With regard to evidence from States which have not adopted exclusionary rules, the Court's innovation of today deprives the federal courts of relevant evidence through hazardous constitutional determinations without any significant or legitimate compensating effect upon state or federal law enforcement. In States which do apply an exclusionary rule, the Court's new formulation accords no respect to valid state policies and is a source of conflict with state

courts. The Court promulgates a rule whose only practical justification is the regulation of state officials without the slightest regard for achieving harmony with valid state laws which necessarily must be the primary concern of those officials. And although the Court recognizes considerations of "judicial integrity" in accepting illegally seized evidence, it refuses to respect state determinations that certain evidence has in fact been illegally gathered under the applicable law.

I would agree wholly with my Brothers CLARK, HARLAN and WHITTAKER, who join me in the reasons for dissenting from the Court's decision, that the judgments should be affirmed if, like them, I found the only choice to be one between the *Weeks-Byars* doctrine and today's decision. For me, however, the course of events since the promulgation of the *Weeks* doctrine suggests a modification of it consonant with the thinking of *Weeks* and therefore not essentially departing from it. I would modify the *Weeks-Byars* rule to give due heed to appropriate comity between federal and state court determinations and due respect for the discretion left to the States by *Wolf* v. *Colorado* to develop and apply exclusionary rules upon their own initiative and I therefore would exclude the evidence in these cases on the basis of state decisions to suppress it. Specifically, I would recognize that about half the States have now adopted exclusionary rules although only one State had such a rule when the *Weeks* case was decided. It respects what was decided in *Weeks* regarding state-seized evidence for the federal courts now to adjust their rules of evidence to support the States which have adopted the *Weeks* exclusionary rule for themselves, thereby exercising the same control over state officials as *Weeks* found it appropriate for the federal courts to exercise over federal officials. Thus, although I find no good reason not to admit in federal courts evidence gathered by state officials in States which would admit the evidence, I would

not admit such evidence in cases like the present, where state courts, enforcing their exclusionary rules, have found their officers guilty of infractions of the rules properly regulating their conduct and have suppressed the evidence. Just as Mr. Justice Holmes and Mr. Justice Brandeis in *Burdeau* v. *McDowell*, 256 U. S. 465, 476–477 (dissenting), deemed it not seemly for a federal court to allow the Department of Justice to be the knowing beneficiary of stolen goods, so it seems to me unseemly for a federal court not to respect the determination of a state court that its own officials were guilty of wrongdoing and not to support the State's policy to prevent those officials from making use through federal prosecution of the fruits of their wrongdoing. Dealing with the generality of cases, as rules of evidence should, to let a state determination regarding the legality of the conduct of state officials determine the admissibility in a federal court of evidence gathered by them would not only avoid a retrial of identical issues in the federal court, but would also avoid the unseemliness and disruption of state authority involved in having a federal court decide that a search was legal, as it might well do when the federal constitutional standards are narrower than state standards, after a state court has adjudged the search illegal.

I am not unmindful that this has its own difficulties, as for instance, the fact that state motions to suppress · are normally determined only by a trial judge and are generally not reviewable at all if granted and followed by acquittal. And so a state court decision may not inevitably reflect the State's judicial policy as formulated by its highest court. Difficulties would also be present when there has been no state decision regarding the legality of the seizure, and when it is not clear to the federal court which must decide upon admissibility what the state decision would be. Occasionally, a state decision might

unjustifiably frustrate an important federal prosecution dependent upon state-seized evidence. These are difficulties inherent in evolving harmonious relations in the interconnected interests between the States and the Nation in our federal system. The consequences of these difficulties seem to me far less weighty and much less dubious than those of the upsetting decision of today. They seem to me outweighed by the support which should be afforded to valid state law enforcement.

If the modified rule I have outlined is not to be adopted, however, the difficulties in the Court's decision make it far more preferable in my view to continue adherence to the sharp line drawn by *Weeks* and *Byars* between state- and federally-seized evidence. I would not embark upon a hazardous jettisoning of a rule which has prevailed in the federal courts for half a century without bringing to the surface demonstrated evils, indeed without its having evoked serious criticism of weight, barring recent discussion largely of an abstract and doctrinaire nature.*

Memorandum of MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join.†

I subscribe to all that my Brother FRANKFURTER has written in criticism of the Court's newly fashioned exclusionary rule. But, with deference, I must also say that, in my view, the arguments which he has so convincingly set forth likewise serve to block the more limited inroads

---

*See the authorities cited in the Court's note 2, and see *Hanna* v. *United States*, 104 U. S. App. D. C. 205, 260 F. 2d 723, the only Court of Appeals decision to concur with the views the Court today expresses. What criticisms there have been of the *Weeks* rule have largely been stimulated by *Wolf* and have in essence been reflections of dissatisfaction with the substantive decision in that case, and thus do not constitute supports for the doctrine now evolved by the Court.

†[This memorandum applies also to No. 52, *Rios* v. *United States, post*, p. 253.]

which he would make on the so-called "silver platter" doctrine. *Lustig* v. *United States,* 338 U. S. 74, 79. I would retain intact the nonexclusionary rule of the *Weeks* and *Byars* cases, which has behind it the strongest judicial credentials, the sanction of long usage, and the support of what, in my opinion, is sound constitutional doctrine under our federal scheme of things, doctrine which only as recently as last Term was reiterated by this Court. See *Abbate* v. *United States,* 359 U. S. 187; *Bartkus* v. *Illinois,* 359 U. S. 121. Except for this reservation, I join the dissenting opinion of my Brother FRANKFURTER.

I would affirm the judgments in both of the cases before us.