[J-107-2016] [MO: Saylor, C.J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 35 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 2099 MDA 2014 dated |
| | : | September 22, 2015, reconsideration |
| v. | : | denied November 23, 2015, Affirming |
| | : | the Judgment of Sentence of the |
| | : | Dauphin County Court of Common |
| DARRIN ORLANDO MATHIS, | : | Pleas, Criminal Division, at No. CP-22- |
| | : | CR-0000174-2014 dated November 25, |
| Appellant | : | 2014. |
| | : | |
| | : | ARGUED:  November 2, 2016 |

**DISSENTING OPINION**

**JUSTICE WECHT**                    **DECIDED:  November 22, 2017**

Darrin Orlando Mathis was a private citizen.  He was not a parolee or probationer over whom state parole agents had any authority pursuant to the Prisons and Parole Code (hereinafter, "Parole Code").[1]  Nonetheless, during a routine visit to the home of parolee Gary Waters, two parole agents detained Mathis and frisked him.  The learned Majority holds that, although parole agents have no statutory authority over third parties whom they encounter in the performance of their duties, they nonetheless possess "ancillary" authority over such private citizens.  Maj. Op. at 15.  Consequently, according to the Majority, parole agents have the authority to conduct a protective frisk of non-

---

[1]    *See* 61 Pa.C.S. §§ 6101-53.

parolees within the course of executing their statutory duties, premised upon reasonable suspicion. *Id.* at 18.[2]

I cannot agree. There is no statutory basis, "ancillary" or otherwise, for holding that parole agents have authority over private citizens whom they encounter in the performance of their duties. But there is, or can be, a constitutional basis. Our law requires that interactions between parole agents and third parties be examined in light of the state action doctrine, as governed by Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution. As state actors, parole agents are bound by our Constitutions, irrespective of the presence or absence of statutory authority. Settled precedent imposes a reasonableness test in all such contexts.[3] Under this venerable constitutional principle, I agree with the Majority that parole agents may conduct a protective frisk of non-parolees within the course of executing their statutory duties, subject to the constitutional requirements of reasonable suspicion that criminal activity is afoot and a reasonable belief that the agents might be in danger. However, I cannot agree with the Majority that the parole agents in this case possessed the requisite individualized reasonable suspicion that Mathis was engaged in criminal activity. Under the facts of record, therefore, I believe that suppression is warranted, and I must respectfully dissent.

---

[2] *See Commonwealth v. Rodriquez*, 614 A.2d 1378, 1383-84 (Pa. 1992) (recognizing that police officers may seize a person and conduct a limited search of the individual's outer clothing for weapons, "if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot and that the person with whom he is dealing may be armed and dangerous").

[3] *See, e.g., New Jersey v. T.L.O.,* 469 U.S. 335 (1985); *Terry v. Ohio*, 392 U.S. 1, 19 (1968); *Elkins v. United States*, 364 U.S. 206, 222 (1960).

The Parole Code establishes the statutory authority of state parole agents over parolees by defining the agents' supervisory relationship to "offenders."[4] The Parole Code grants the parole agent authority to make a warrantless personal search of a parolee premised upon reasonable suspicion that the parolee possesses contraband or evidence of a parole violation, 61 Pa.C.S. § 6153(d)(1)(i), to conduct property searches with prior approval or under exigent circumstances, *id.* at § 6153(d)(3), and to detain a parolee who is present during a property search, *id.* at § 6153(d)(5). Nothing in the Parole Code provides parole agents with authority over non-offenders or private citizens. The Parole Code does not address—much less define—the limits of a parole agent's interaction with a third party.

For "ancillary" authority to exist, it must, *a fortiori*, be "ancillary" to something. *See Merriam-Webster's Dictionary of Law*, 1996 (defining ancillary as "having a subordinate, subsidiary, or second nature[,]" "serving as a supplement or addition[,]" or "directly related"). Here, because the Parole Code provides no statutory authority for the agents' actions vis-à-vis third parties, no foundation exists upon which any "ancillary" power may be appended. Further, it is contrary to settled principles of statutory interpretation and judicial restraint for courts to manufacture "ancillary" authority. Only the General Assembly can establish statutory authority, "ancillary" or otherwise.

The Parole Code is silent regarding the requirements of (or limits to) the interaction between parole agents and individuals who happen to be present when the

---

[4] An "[o]ffender" is defined as "[a]ny person subject to the parole or probationary supervision of the [Pennsylvania Board of Probation and Parole]." 61 Pa.C.S. § 6151.

parole agents are executing their statutory duties. We are not presently addressing a statutory violation as such. Instead, we are confronting an absence of statutory authority. Because no statute authorizes or restricts a parole agent's ability to act with respect to a third party, we are left with our Constitutions as the only relevant yardsticks to review the exercise of governmental authority.[5]

There is no dispute that the parole agents are state actors by virtue of the Parole Code. Agents Welsh and Bruner were acting within the scope of their employment and fulfilling their statutory supervisory duties when they entered Waters' approved residence to conduct a routine home visit. Moreover, Agents Welsh and Bruner displayed their authority in a manner that imbued their actions with an unmistakably

---

[5] As the Supreme Court of the United States has explained, the Fourth Amendment has never been understood as "a redundant guarantee of whatever limits on search and seizure legislatures might have enacted." *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008). Whether a search is constitutionally reasonable does not "depend on the law of the particular State in which the search occurs." *California v. Greenwood*, 486 U.S. 35, 43 (1988). Although local statutes may "vary from place to place and from time to time," the Supreme Court has established that the Fourth Amendment's protections are not "so variable." *Whren v. United States*, 517 U.S. 806, 815 (1996). *Cf. City of Ontario*, 560 U.S. at 764 ("Respondents point to no authority for the proposition that the existence of statutory protection renders a search *per se* unreasonable under the Fourth Amendment. And the precedents counsel otherwise."); *see also United States v. Williams*, 124 F.3d 411, 425-28 (3d Cir. 1997) (holding that disclosure of wiretapped calls to grand jury in violation of Pennsylvania statute did not warrant suppression in federal prosecution); *State v. Slayton*, 223 P.3d 337, 346 (N.M. 2009) (providing that where an arrest was made by a police service aide in violation of a statute requiring such an arrest to be made by a uniformed, commissioned police officer, "[t]he only inquiry of consequence to the Fourth Amendment is whether the state actor has reasonable suspicion to detain or probable cause to arrest the defendant for a crime committed in his or her presence").

official quality.[6]  Consequently, they acted under color of state law when they detained

Mathis.[7]

Because the parole agents were behaving as state actors, their interaction with

Mathis was limited by the "fundamental command" of the Fourth Amendment that a

search or seizure may not be unreasonable.  *New Jersey v. T.L.O.*, 469 U.S. 325, 340

(1985); *see also Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the

Constitution forbids is not all searches and seizures, but unreasonable searches and

seizures.").  The central inquiry under the Fourth Amendment in this case, as in all such

cases, is "the reasonableness in all the circumstances of the particular governmental

invasion of a citizen's personal security."  *Terry v. Ohio*, 392 U.S. 1, 19 (1968).

In *Terry*, the United States Supreme Court held that an investigatory stop and

frisk requires both reasonable suspicion that criminal activity is afoot and that the

individual is armed and dangerous.  *Terry*, 392 U.S. at 22-24.[8]  Consistent with this

---

[6]     *See Commonwealth v. Price*, 672 A.2d 280, 284 (Pa. 1996) (holding that an FBI agent engaged in conduct fairly attributable to the state when he stopped the defendant by using his lights and sirens and displayed his FBI badge, an "obvious display of authority" which "imbued his actions with an official aura").

[7]     Although the parole agents were acting outside of the scope of their statutory authority when they seized Mathis, the Parole Code is not irrelevant to the *constitutional* analysis.   The Parole Code established the parole agents as state actors and authorized the agents to be in Waters' residence.  This authority led to the agents' interaction with Mathis.  To be lawful, any such interaction must comport with the constitutional requirement of reasonableness.  *See Elkins v. United States*, 364 U.S. 206, 213 (1960) ("[T]he Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers."); *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) ("[The] origin and history [of the Fourth Amendment] clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies. . . .").

[8]     Although the protection against unreasonable searches and seizures afforded by the Pennsylvania Constitution is broader than that conferred by the United States (continued…)

authority, I would hold that, if parole agents acting within the scope of their employment and executing their duties pursuant to the Parole Code develop reasonable suspicion that their parolee and a third party are engaging in criminal activity, it is reasonable for Fourth Amendment purposes for those agents to intervene in order to fulfill their statutory supervisory obligations as to their offender and to maintain the *status quo* while the agents summon police officers. Further, in view of this limited constitutional authority to detain third parties in order to halt ongoing criminal activity, the parole agents also have the constitutional authority to frisk such persons for weapons if they have reason to believe that those persons are armed and dangerous. *See Terry*, 392 U.S. at 27. As the Court held in *Terry* with respect to police officers, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

The evidence in this case demonstrates that the parole agents seized Mathis when they directed him to gather his belongings and move into another room. Agent Welsh's command to Mathis to grab his belongings and relocate to another room would convey to a reasonable person that he or she was not free to leave and was, therefore, detained. *See Commonwealth v. Jones*, 378 A.2d 835, 839 (Pa. 1977) (holding that, in assessing whether there was a detention, the court will view all circumstances

_____

(…continued)
Constitution, we have always followed *Terry* in stop and frisk cases. *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997).

evidencing a show of authority or exercise of force to assess whether a reasonable person would have thought he or she was being restrained); *Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). If, as the Majority holds, Mathis was free to leave until the moment that Agent Welsh seized Mathis' jacket, the parole agents could simply have requested Mathis to exit the residence through the kitchen door. By commanding Mathis to relocate to another room, Agent Welsh made clear that departure was not an option.

To comport with our Constitutions, Mathis' detention must have been premised upon reasonable suspicion that Mathis was engaging in criminal activity.[9] However, it is

---

[9]    The Majority suggests that we need not determine in this case whether a parole agent may perform a weapons frisk of a non-parolee in the absence of reasonable suspicion of criminality, suggesting instead that we may wish to confront this issue in a future case. I disagree with this approach. Our precedents do not allow us to countenance a weapons frisk by a parole agent of a non-parolee in the absence of reasonable suspicion of criminality. The Majority appears to forget that *Terry* requires a two-step analysis:

> In a pathmarking decision, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures. The Court upheld "stop and frisk" as constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, Terry determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009); *see also Commonwealth v. Hawkins,* 692 A.2d 1068, 1070 (Pa. 1997) ("[B]efore police may briefly detain a person, there must be reasonable suspicion of criminal conduct, and before police may pat down for weapons, there must be a reasonable belief that the suspect is presently armed and dangerous."). There is no precedent or constitutional authority that permits the Majority
(continued…)

plain from the record before us that Mathis was detained based solely upon Agent Welsh's generalized suspicion arising from an odor of marijuana and the presence of burnt "roaches" in the ashtray, coupled with Mathis' nervousness in the presence of the parole agents. Agent Welsh did not testify that he observed Mathis smoking marijuana, nor did Agent Welsh establish reasonable suspicion that Mathis was engaged at that time in criminal activity. Accepting Agent Welsh's testimony, as the trial court apparently did, the record nonetheless fails to support any finding of individualized suspicion that Mathis was involved in criminal activity at any relevant time such that Mathis' detention could be sustained under our Constitutions.[10] The evidence revealed by the ensuing frisk should have been suppressed, as it derived from the initial, unlawful detention. *See Wong Sun v. United States*, 371 U.S. 417 (1963); *Commonwealth v. Hernandez*, 935 A.2d 1275, 1283-84 (Pa. 2007).

Accordingly, I cannot subscribe to the Majority's view that Agent Welsh possessed some "ancillary" statutory authority to detain and frisk Mathis. Instead, evaluating the interaction between Agent Welsh and Mathis as an interaction between a state actor bound by our Constitutions and a private individual, I am compelled to

---

(…continued)
to dispense with the first step of the *Terry* analysis. The Supreme Court of the United States has rejected the view that inherent danger obviates the need for reasonable suspicion of criminal activity prior to a weapons frisk. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990).

[10] Even assuming, *arguendo*, that the detention did not commence until Agent Welsh grabbed Mathis' jacket (as the Majority posits, Majority Opinion at 22), the record does not support a finding of individualized suspicion that Mathis was harboring contraband related to the odor of marijuana. Standing alone, Agent Welsh's belief that Mathis might be harboring a weapon could not justify a detention. Even where there is a possibility that an individual is armed, "*Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Buie*, 494 U.S. at 334.

conclude that the detention was not supported by the requisite reasonable suspicion that criminal activity was afoot. Under these circumstances, suppression was warranted. I respectfully dissent.